### SAMUEL CHAUNCY ET AL. *versus* JOSHUA YEATON, PLAINTIFFS IN REVIEW.

Where property is taken from the owners tortiously, they may waive the use, and in assumpsit recover the money received by the wrong doers for the use of it, as well as the price for which it may have been sold. But if the use to which the property may have been put, was one prohibited by law, the plaintiffs cannot recover, either from the trespasser or an agent, the money received for that use.

Interest may be recovered on money received for property wrongfully converted.

ASSUMPSIT, by Chauncy and others, against Joshua Yeaton and William Yeaton. The writ was served upon Joshua alone, and returned *non est inventus* as to William.

The declaration contained two counts : one for $24,000, money had and received : the other for $33,704 20 : the balance of the following account annexed to the writ.

August, 1813.  Dr. to cash for freight of 4257 barrels of flour, in ship William & Henry,              $24,000

|  |  |
|---|---|
| One year's interest on ditto, | 1,440 |
| Freight of 324 bags of corn, | 500 |
| Cash for price of above ship, | 13,000 |
| Seven months' interest on ditto, | 455 |
|  | $39,395 00 |
| Credit by bills of exchange, worth | 5,690 80 |
| Balance, | $33,704 20 |

The defendant pleaded that he and the said William never promised, &c. On the trial, at the last term here, it was admitted, or clearly proved, that, in January, 1813, the plaintiffs were joint owners, in different proportions, of the ship William & Henry ; that on the 4th of said month, under the command of one Kennard, she sailed from Portsmouth, in this state, for Alexandria, where William Yeaton, to whom Chauncy had previously written to procure freight, and to whom he ordered the master to apply, for the purpose of obtaining it, resided. The ship arrived there on the 25th of the same month : Kennard called upon W. Yeaton, who procured a cargo of 4257 barrels of flour, to be shipped on account of a Mr. Howell, of Philadelphia, on freight for

Chauncy & al.
*vs.*
Yeaton.

Europe, and also purchased and put on board 324 bags of corn on account of the owners.

On the 18th of February, 1813, the ship cleared for Lisbon ; but was, on the 4th of March following, met and turned back by the British blockading squadron in Lynn Haven Bay. She reached Alexandria again the 13th, and the owners, on learning the above facts, directed the cargo to be kept on board. On the 6th of April, the master discharged all the crew, except one boy and the mate, a Mr. Hobart ; with whom he left the ship's papers and verbal orders to keep charge of the ship until otherwise directed by the owners. Kennard then returned on a visit to his family in New-England : soon after this, the ship was taken possession of by the defendants and others ; Swedish colors hoisted ; her name altered to the " Carl ;" one Offatt, a Swede, put on board as nominal commander ; Hobart hired as sailing master ; Joshua Yeaton shipped as supercargo ; a new contract made with Howell as to freight ; the ship transferred by Yeaton and others to one Hurd, a commission merchant at St. Bartholomews ; a certificate put on board, that the property belonged to Messrs. Yeatons & Conway ; a British license was obtained from Admiral Warren, through the agency of one Beverly and General Henry Lee ; and, thus equipped, on the 30th of April the ship cleared for St. Bartholomews. In latitude 29 degrees north, her course, by the direction of Joshua Yeaton, was altered to Barbadoes, where she arrived on the 19th of June. She was immediately seized, by Capt. Dacres. Being claimed by said Joshua, as American property, under the protection of a British license, she was, on a compromise, restored ; the cargo there sold ; and the proceeds paid to said Joshua. The freight, after deducting the expenses of the seizure, &c., amounted to $24,728. The ship was then ordered, by said Joshua, to St. Bartholomews, for further freight, where she was seized by Hurd, as his property, delivered up again, on a compromise, and sold for $13,000, in bills of exchange. Joshua returned to this country, and

Chauncy & al.
*vs.*
Yeaton.

after deducting losses, expenses, &c., paid to *William Yea-ton* the value of the ship, and to the others concerned their respective proportions of the net profits.

There was also in the case some contradictory testimony upon the following points : The defendant introduced depositions and a very voluminous correspondence between *Wm. Yeaton* and the plaintiffs, to shew that an authority had been conferred by them upon *William* to dispose of the ship ; that, after she was left by *Kennard*, and before her conversion into a Swede, *William*, in pursuance of that authority, had sold her to *Joshua Yeaton* and others for $13,500 ; of which sum there had since been paid to one of the plaintiffs, in bills of exchange, $6,630 ; and that after said sale *William* ceased to possess any interest or concern in her.

The plaintiffs offered letters and depositions, to rebut the inferences deduced from what was contained in those read by the defendant ; and, on the whole testimony, contended that no authority whatever had been given *William Yeaton* to sell the ship ; that those who, at *Alexandria*, took the possession of her from *Hobart*, did it as trespassers ; *so* freighted and conveyed her to the *West-Indies*, and so received her earnings and her price : that, possessing a right to waive the tort, they claimed in this form of action a verdict against the defendant for all the money he and *William* had received, both for the use and the sale of their property.

The defendant, on the other hand, contended, that the evidence showed an authority in *William* to sell, and consequently, he alone being liable for the balance due for the price of the ship, *Joshua* was entitled to a verdict. But if his authority was not clearly proved, it was further contended that the voyage, having been made under a British license, became illegal, and the plaintiffs ratifying it by this action could not recover its profits, but merely the money received for the ship at *St. Bartholomews*.

The court directed the jury that if, on considering all the testimony, they were satisfied that *Wm. Yeaton* had an au-

Chauncy & al.
*vs,*
Yeaton.

thority from the plaintiffs to sell the ship, or that the sale by him was subsequently ratified by the plaintiffs, *Joshua,* the defendant, ought not to be charged. On the other hand, if they were not satisfied that *William* made such sale, but believed that he, without authority, aided *Joshua* and others to take the ship into custody, and send her to the *West-Indies,* or afterwards participated in the profits of that speculation, the action was well brought against them both, and the plaintiffs were entitled to recover all the money obtained for the ship and her freight, with interest after the receipt until the former judgment ; deducting, however, necessary expenses and what had heretofore been paid.

They were also directed to find the amount received by defendant for the ship, and the amount which had been paid to the plaintiffs by *Wm. Yeaton,* in order that the verdict might be reduced, if for the plaintiffs, to the amount of the balance, with interest thereon, provided the court, on further consideration, should entertain an opinion that the plaintiffs could not recover for the freight received on the voyage, because made under British license, and to a colony of an enemy.

The jury returned a verdict for the plaintiffs for $24,000, and found that the ship was sold for $12,500, and found the amount paid the plaintiffs to be $3,690 80 cents.

This verdict was received, subject to be amended or set aside, as the court might think proper, after advising on the above points.

*Haven* and *Mason,* for the plaintiffs.

*Pitman,* for defendant.

WOODBURY, J., delivered the opinion of the court.*

It is obvious that the owner of property, which has been wrongfully converted, should possess a right to institute such a suit for the injury as will afford him an ample indemnification. If the wrong doer hath sold, or used and then sold the property, the owner may waive the tort, and in assumpsit recover the net proceeds received both for the use and

---

RICHARDSON, C. J., having been of counsel, did not sit in this cause.

by the sale. *Cowp.* 371, *Hambly* vs. *Trott ;* 10 *Mass. Rep.* 436. The amount recoverable in assumpsit cannot, upon general principles, operate unfavorably to the trespasser.

In an action *ex contractu,* nothing can be obtained from him except what has in fact been received for the use and by sale of the property : while in one *ex delicto,* he may be subjected vindictively to pay much more than the real value of the article converted. Considering him, therefore, in the words of Jackson, J., in *Cumming's et al.* vs. *Noyes,* 10 *Mass. R.* 436, as " a purchaser, or agent, or a bailee," gives him no just cause of complaint, because it visits on him no actual loss ; the amount recovered being merely the amount obtained as the fruits of the trespass.

The form of action being in our opinion correct, it remains for us to decide what we have ever considered the principal question in the case, whether any portion of the receipts for the use of the plaintiffs' property can here be recovered. That the plaintiffs are entitled to recover the amount for which the ship sold at *St. Bartholomews,* we have never doubted ; as that sale was to neutrals, and not in an enemy's country. We should also doubt as little, the right of the plaintiffs to consider the defendants as their agents in freighting and navigating the ship to the *West-Indies,* and therefore liable for the net profits so received, had the voyage been of an unexceptionable character. Such as it was, however, the plaintiffs, in this part of their claim, adopt the voyage as performed by their direction. They treat *Joshua Yeaton* as their agent, and ratify his doings, and ask for the benefit of his acts. But it must be admitted, that a court of justice would pervert the design of its institution, were it to lend any aid to parties to recover the proceeds of voyages, performed in violation of good morals and wholesome statutes. The ship in this case proceeded, in point of fact, directly from this country to an enemy's colony ; and this, too, by order of the agent, and supposed part owner. The whole interest in the ship and freight, notwithstanding the alteration of her name, &c., continued *American,* and as such,

Chauncy & al.
*vs.*
Yeaton.

under British license, was eventually protected at *Barbadoes.*
This license, too, was not only obtained and used by those
adventuring in the expedition, but the cargo itself was se-
lected, or at least was suitable for an enemy's market, and
was there sold to persons in open hostility with the *United
States.* We entertain no doubt that a voyage, so com-
menced, prosecuted and completed, must, in a court of law
as well as of admiralty, be considered as altogether illegal.
1 *Com. c.* 36.—1 *Rob. ad.* 196.—8 *D. & E.* 548.—1 *Gal.*
303.—8 *Cranch* 181.

Nor is it material in this case, whether the illegality con-
sisted in the voyage's having been *malum in se,* or *malum
prohibitum.* Courts are forbidden to aid in enforcing claims
arising from acts of either character, *ex dolo malo non oritur
actio ;* and this suit, if regarded as a prosecution by the
owners to collect from their employers compensation for a
voyage thus unwarrantable, cannot for a moment be endur-
ed (1). But we are aware that this part of the claim may
be viewed under another aspect, apparently more favorable
to a recovery, by supposing the action to have been insti-
tuted by the owners merely to obtain from their agent
money, which he has already collected from those who
freighted the vessel.

(1) Cow. 343.
1 Bos. & Pul.
555.—2 Wils.
341.

Its object will then be to compel a servant to pay over
money received by him from the employers of his master,
as compensation for the performance of an illegal act. Such
a view better accords with the facts ; although a recurrence
to principles will disclose the insufficiency even of this view
of the transaction to support the verdict. A recovery is for-
bidden in this class of cases, not because any favor is felt
for the defendant ; but on account of the impurity of the sub-
ject matter of the claim, and the pollution which soils the
plaintiffs in connecting themselves with that subject matter.

Public policy requires the absolute defeat and rejection of
all such claims, in order that every legal obstacle may be in-
terposed to put a stop to such transactions.

The following cases are, we apprehend, somewhat parallel,

Chauncy & al.
vs.
Yeaton.

and decidedly against a recovery of the profits of the voyage, 3 *Esp. C.* 252, *Norman* vs. *Cole.*—2 *Caines* 147, *Belding* vs. *Pitkin.*—3 *Cranch* 242, *Hannay* vs. *Eve.*—1 *Bin.* 120.—5 *John.* 434.—6 *D. & E.* 405, *Booth et al.* vs. *Hodgdon.*—2 *Gal.* 560, *Fales et al.* vs. *Mayberry.*

We are gratified to find, however, that the plaintiffs may still obtain the full value of their property converted, although we cannot aid them to participate in the illegal earnings of the vessel. The verdict must, therefore, be amended, by reducing the damages to the price of the ship found by the jury, deducting therefrom the money afterwards paid the plaintiffs, and adding interest on the whole to the time of that payment, and on the balance to the time of the former recovery. In a case circumstanced like the present, we consider the allowance of interest to be strictly conformable both to equity and law. Because, as observed in *Elkins* vs. *The East India Company, Peere Williams,* 396, " if a man has money by way of loan, he ought to answer interest ; but if he detains my money wrongfully, he ought *a fortiori* to answer interest : and it is still stronger when one by wrong takes from me my money or my goods, which I am trading with, in order to turn them into money." Vid., also, 1 *Bin.* 494.—3 *ditto* 121.—9 *John.* 71.—11 *Mass. Rep.* 504.

On the verdict thus amended, let judgment be entered for the plaintiffs.