## DAVID SHAW *versus* JONATHAN P. DODGE.

The Lord's day, within the meaning of the statute of Dec. 24, 1799, includes twenty-four hours, beginning and ending at midnight.
The service of civil process on that day is illegal.

THIS was an action of trespass for an assault and false imprisonment. The defendant justified under legal process, as a collector of taxes for the town of Fishersfield. The plaintiff replied, that the arrest was made on the 11th day of April, 1830, which was the Lord's day ; and issue was thereupon taken.

On trial of the above issue here, at February term, 1831, it appeared in evidence, that the arrest was made sometime in the night following the 10th, or early in the morning of the 11th day of April, 1830.

The court instructed the jury, that if they were satisfied, from the evidence, that the defendant made the arrest at any time after twelve o'clock in the night following the said 10th day of April, it was illegal, and the plaintiff was entitled to a verdict.

The jury having returned a verdict for the plaintiff, the defendant moved the court for a new trial, on the ground that the jury were misdirected.

*Tuppan* and *I. Bartlett*, for the defendant, contended, that the arrest was not illegal, unless made after sunrise on the morning of the said 11th day of April.

*A. Rogers*, for the plaintiff.

*By the court.* The decision of this cause depends on the construction of the statute of Dec. 24, 1799. The first section of that statute enacts, " that no tradesman, artificer, or any other person whatsoever, shall do or exercise any labor, business or work of their secular callings, works of necessity and mercy only excepted, nor use any game, play, or recreation, on the first day of the week, commonly called the Lord's day, or any part thereof."

It is not doubted, that the serving of civil process falls within the prohibition, is unlawful, and cannot be justified, if done on the Lord's day. The question to be decided is, what particular portion of time does that day embrace, according to the true intent and meaning of the statute ?

To settle this question, it is necessary to ascertain when the day begins.

Ancient nations differed much as to the commencement of the day. The Chaldeans, Syrians, and Persians began the day at sun-rise. The Chinese began their day at midnight. The Hebrews computed their days from evening to evening, Lev. XXIII. 32 ; and it is remarkable, that the evening or natural night, precedes the morning, in the history of the creation.

According to Tacitus, the ancient Germans, instead of days, reckoned the number of nights. De Mor. Germ.

c. 11. Cæsar asserts the same of the ancient Gauls. De bell. Gall. Lib. 6. c. 17. Vestiges of this ancient custom still exist in our own country. We say last Sunday se'n-night, and this day fortnight.

The Romans called the time between the rising and setting of the sun the natural day, and the time in the whole four and twenty hours the civil day, which they began and ended at midnight. This definition of the Romans has been adopted in modern Europe.

A due observation of the Lord's day was an early object of attention with our pious ancestors; and a recurrence to former statutes may afford some light upon the subject. By a statute of the 12th of William III. entitled " an act for the better observation and keeping the Lord's day," persons keeping public houses of entertainment are prohibited from suffering any inhabitant, or others, not being strangers or lodgers in such houses, " to abide or remain in their houses, yards, orchards, or fields, drinking or idly spending their time on Saturday nights, after the sun is set, or on the Lord's day, or the evening following;" and it is made the duty of justices of the peace, constables, and selectmen, to restrain all persons from " keeping open their shops, or following their secular occasions or recreations in the evening preceding the Lord's day, or any part of the said day, or evening following."

This statute was explicit as to the time, during which labor, &c. was prohibited, and evidently extended it beyond twenty-four hours.

It is a well known fact, that many of the New-England Puritans, adhering to the doctrine of the Hebrews, and believing it to be the doctrine of the Bible, held that the sabbath, or *holy time*, as they called it, began at sunset on Saturday night, and conscientiously abstained from all labor and recreation after that time, observing the evening preceding Sunday with the same scrupulous strictness, as they did the day itself. Others believed

midnight to be the commencement of the day, and, of course, observed the evening following Sunday, as holy time. The object of the legislature probably was to meet the different views then entertained, respecting the commencement of the Lord's day, by embracing all the time, which was, by any persons, supposed to constitute a part of it.

The last mentioned statute, which was passed in 1700, remained in force, until Feb. 2, 1789.

The statute of 1789, of which the first section of the statute now under consideration is a literal copy, first omitted to give any other definition of the time, in which labor, &c. was prohibited, than "the first day of the week, commonly called the Lord's day."

The object of the legislature undoubtedly was to prevent unnecessary labor and recreation during one seventh part of the time. When they used the term *day*, it is to be presumed, that they intended it to be understood in its common acceptation, that is, a *civil day*, embracing twenty-four hours, and commencing and ending at midnight. Such, it is believed, has been the common understanding and practical exposition of the term in this and all other statutes, in which it occurs. Under the statute, which requires writs to be served fifteen days before the sitting of the court, to which they are returnable, the uniform practice has been to make service till midnight of the last day, but not afterwards.

It has been suggested, that the second section of the statute, under consideration, has qualified the term *day*, as used in the preceding section, and restricted it to the *natural day*. The words are, " that no person shall travel on the Lord's day between sunrising and sunsetting, unless from necessity," &c.

In reply to this suggestion, it may be observed, that the legislature, probably considered travelling an offence distinct from those before enumerated, and they have treated it accordingly. Persons might travel without

being engaged in " their secular callings," and not in the use of " any game, play, or recreation." Additional and peculiar provisions are made for the prevention of travelling on Sunday. Selectmen and tything men are authorized " forcibly to stop and detain any person or persons, they shall suspect of travelling unnecessarily on said day." Sufficient reasons for a distinction between travelling and exercising the business of one's secular calling, on the Lord's day, will readily occur. An important object undoubtedly was to protect people from interruption and annoyance on their way to and from their respective places of public worship, and while engaged in their religious devotions. These evils would naturally arise in the day time only.

Upon the whole, we think, that nothing in the second section of the statute can properly be construed to qualify or restrict the general expression adopted in the first section ; but that the limitation of time therein mentioned must be confined to the offence of unnecessary travelling.

We are, therefore, of opinion, that the jury were correctly instructed, and that there must be

*Judgment on the verdict.*