# STRAFFORD,

## DECEMBER TERM, A. D. 1848.

---

## VARNEY *v.* FRENCH.

19 233
68 63

The act of December 24th, 1799, prohibited the transaction of secular business on the Lord's day, under a penalty, without any qualification, whether it were performed by a person alone, or in company with others.

The first section of chapter 118 of the Revised Statutes so far altered the law that it prohibited the transaction of secular business on the Lord's day, only when it was done to the disturbance of others.

Any business tends to the disturbance of others, and is, consequently, prohibited, which withdraws the attention from the appropriate duties of the Sabbath, and turns it to other things.

An act done by a person is none the less a disturbance within the meaning of the statute, although other persons present may not object to its performance.

A contract for the sale of a mare was made on Sunday, and a promissory note for the price was executed and delivered on that day. The note was given at the house of the plaintiff, whose wife was present in the room where the contract was made, reading a newspaper, and she and a witness were the only persons present when the contract was made, except the parties. *Held,* that the act of giving the note was a business of a secular calling, tending, under the circumstances, to the disturbance of others within the meaning of section 1 of chapter 118 of the Revised Statutes, and that no action could be maintained on the note.

ASSUMPSIT, on a promissory note, made by the defendant and dated on the 28th day of August, 1847, for the sum of $80, payable to the plaintiff, on demand. The writ was dated on the 9th day of December, 1847.

Plea, the general issue, with a brief statement, alleging,

among other things, that the note was given, and the con-
tract forming its consideration made, on Sunday.

At the trial, it appeared that the note was given for the
purchase money of a mare, that the contract of sale was
made on Sunday, and that the note was written, signed and
delivered on that day, and was antedated, that it might not
bear date on Sunday. The note was given at the house of
the plaintiff, and his wife was present in the room while the
conversation was going on and when the note was given,
reading a newspaper, and no other person was present ex-
cept the parties and the witness, who went to the house
with the defendant.

The court instructed the jury that the fact that the note
was made on Sunday, was no bar to the plaintiff's right to
recover.

The jury returned a verdict for the plaintiff, which the
defendant moved to set aside.

*Christie*, for the plaintiff.

*Woodman, Eastman*, and *J. S. Wells*, for the defendant.

GILCHRIST, C. J. The act of December 24th, 1799, pro-
hibits any person from doing or exercising any labor or busi-
ness or work of his secular calling, upon the Lord's day,
under the penalty of from one to six dollars. N. H. Laws
167, (ed. of 1830.)

Under this statute, it was held in the case of *Frost* v.
*Hall*, 4 N. H. Rep. 153, that the seizure of swine, found at
large in violation of law, by a hogreeve, was a work or busi-
ness belonging to a secular calling within the meaning of
the statute, and as such prohibited. In the subsequent case
of *Shaw* v. *Dodge*, 5 N. H. Rep. 462, it was held that the
service of civil process fell within the prohibition, was un-
lawful, and could not be justified, if done upon the Lord's
day. And the doctrine of these cases seems to be recog-

nized in *Clough* v. *Davis*, 9 N. H. Rep. 500, although in that case it was unnecessary to decide whether the note on which the action was brought was void, as having been made on Sunday. But in the case of *Allen* v. *Deming*, 14 N. H. Rep. 133, it was decided that the execution and delivery of a promissory note on Sunday, was " business " of a person's " secular calling," and as such was prohibited under a penalty, and that the note was void.

The law remained in this condition until the passage of the Revised Statutes. It is there enacted, by section 1 of chapter 118, that no person shall do any work, business or labor, of his secular calling, *to the disturbance of others*, on the Lord's day, under a penalty.

The question, then, arises, what alteration, if any, has been made in the law by this section ? What is the meaning of the words " to the disturbance of others ?"

As to the point whether the Legislature intended to alter the law in this particular, we entertain no doubt. The law had been generally understood from the Reports, and the substantial reënactment of the former statute, with the insertion of these words, renders it sufficiently apparent that some modification of the former law was intended. And there is an evident distinction between the two statutes, apparent from reading them together and comparing them. The act of 1799 prohibits the exercise of the *secular calling*, without any qualification. Whether it be exercised alone or in the midst of a city, whether it be carried on by the offender without assistance, or conjointly with others, whether there be witnesses to the act, or he be tried and convicted on his own confessions alone, the transaction is equally within the prohibition of the statute. It makes no difference whether the calling be a quiet and noiseless pursuit, carried on in the person's own house, or one which attracts the public attention, and is accompanied by noise and clamor. It is enough that the pursuit is a business of the secular calling of the individual. The statute goes fur-

ther than merely to protect the public, and punishes the
offender, not simply because the public quiet is endangered,
or may be so, but because the act is considered to be wrong-
ful in itself, and produces an injurious effect upon him who
performs it. It has both an individual and a general pur-
pose. While it protects the solemnities of religion from in-
terruption, and secures the public in their peaceful perform-
ance, it reminds the individual that he has religious duties
to fulfil, and religious duties alone. It tends to secure to
him time and opportunity for their fulfilment, by prohibit-
ing him from performing other things, and induces him to
turn his attention, for one day in the week, to religious re-
flection, by refusing him permission to distract his mind by
occupying himself with his wordly affairs. It cannot legis-
late him into a religious man, but it keeps him from busi-
ness, and forbids business to come to him, and aims at do-
ing what may reasonably be attained without infringing his
freedom of conscience.

Such is, in our view, the fair and reasonable construction
of the act of 1799, and it is proper to inquire into the con-
struction of the first section of chapter 118 of the Revised
Statutes, in order to see what change has been effected from
the former law.

In the first place, it is obvious that it is not considered
expedient, by the Revised Statutes, to attempt to attain
one object which the act of 1799 had in view, that is, the
good effect upon the individual, by prohibiting him from
exercising his secular calling. By the act of 1799, he could
not do this under any circumstances. By the Revised Stat-
utes he may do it, with a qualification, a condition, and that
is, that it be not " to the disturbance of others." This pro-
vision aims only at protecting the public in their devotions
and religious reflections ; others, the law says, shall not be
disturbed. It leaves each individual to employ himself as he
may choose, subject only to this limitation. It does not aim
at guarding him from himself. It does not seek to interest

him in religion, by forbidding him to interest himself in things not religious. It leaves him to his own conscience, and does not attempt to furnish any other guarantee for the religious and devotional employment of his time, than such as may be afforded by his own views of his religious obligations.

This, then, is an important change in the law. It shows that there is a radical difference in the theories on which the two statutes proceed. How much farther the Legislature intended to go, what meaning they probably attached to the words " to the disturbance of others," is a subject for further inquiry.

The word " disturbance " has no such intrinsic force and meaning as would enable us to determine its effect, apart from the connection in which it appears. Any thing which throws into confusion things settled, which interrupts the movements, pursuits or thoughts of another, may be a disturbance. So if it distract his attention, call his mind off from one train of thought, and divert it to another, it may be said to disturb him. A thousand things might or might not disturb others, in fact, according to their then existing pursuit, and this renders it an extremely difficult thing to lay down a general rule, which shall definitely settle what is or is not a disturbance. If nothing can be considered a disturbance which people willingly submit to, and take a part in, then the Legislature did not intend to prohibit any assembly of persons, for whatever purpose, provided the people present are willing to give up their religious duties, and take part in whatever is done. In such case, they could have no cause for complaint ; *volenti non fit injuria ;* no disturbance has been caused to *them.* Upon this principle, a horse race in a public street would be no disturbance, if the people chose to desert the churches and assemble on the race ground. A military parade on the Sabbath would not be prohibited, if the bystanders, or those who heard it, preferred military to sacred music. A theatre or a circus, a

menagerie or a political caucus, would no more be *distur-bances* than would the services in the churches. But we do not think that such would be the true construction of the act. We think it evident that, in one respect, a radical change has been made, and that the act had a certain intelligible purpose in view, and we are not called upon to construe the statute away, and endeavor to ascertain how few cases can come within it. The only safe meaning we can give to the word "disturbance," is a comprehensive one, going upon the ground that the main purpose of the law was to relieve an individual from the penalty who had been guilty of no act that actually did, or that tended to disturb and distract the minds of others from those religious observances which the act unquestionably intended to respect. Such being the object of the statute, nothing should be tolerated that tends to defeat it. If a person should desire to buy a horse, he would have no right to go to the owner on the Sabbath and make his propositions for the sale, because that would tend to disturb the quiet of the owner on the day which the statute intended should be respected. And even if the owner be willing to be thus disturbed, that willingness will not make the contract valid, for the disturbance is prohibited by the statute. The parties would be *in pari delicto*. In the case before us, the defendant took with him a witness, so that in addition to the disturbance to the plaintiff, there is the further violation of the letter and spirit of the act in regard to the witness, and also the additional interruption to the plaintiff's wife. That these were "disturbances," within the meaning of the act, we are fully satisfied, and any other construction would enable any number of people who were desirous of doing so, to engage in any business or amusement which those who should see and hear might find their pleasure in, and to such an extent we think the Legislature never intended to go.

The contract, then, having been made on Sunday, was

Varney *v.* French.

void, as being prohibited under a penalty, upon which point it is unnecessary to cite authorities. It is equally clear that there can be no ratification of a void contract. A sale of the mare by the defendant could not have that effect. We cannot lose sight of the fact that the defendant obtained her, and the plaintiff parted with her, in pursuance of a contract made on Sunday. The plaintiff, then, can maintain no suit upon or for any matter founded upon the contract, for he does not come into court with clean hands. In such a case, a recovery is forbidden, not because any favor is felt for the defendant, who is equally guilty with the plaintiff, but as Mr. Justice *Woodbury* says, in *Chauncey* v. *Yeaton*, 1 N. H. Rep. 156, speaking of illegal contracts, " on account of the impurity of the subject-matter of the claim, and the pollution which soils the plaintiff in connecting himself with that subject-matter."

Cases of seeming hardship may easily be imagined, where a person who happened to be present might ungraciously interpose his veto upon a transaction, by alleging that the business, however quietly transacted, was a disturbance to him. But this result is necessary, and no ingenuity can avoid it, and cases may happen as they do under the application of all general rules, where injustice may be done. If, however, the natural tendency of an act be to attract the attention of others, how many persons must be affected by it before it can assume the character of a disturbance ? Where shall the line be drawn ? If a disturbance to a solitary individual be not enough, how will it be if there are ten persons to be affected, or a hundred ? It is evident that it would, in all cases, be a question of the application of a principle, and not of convenience or inconvenience, and the rule must be applied in all cases that come within it, whatever results might follow.

*Verdict set aside.*