Richard CROSS, Appellant (Defendant),

v.

**BERG LUMBER COMPANY,**
Appellee (Plaintiff).

No. 99–91.

Supreme Court of Wyoming.

July 20, 2000.

Rehearing Denied Aug. 8, 2000.

Representing Appellant: B.J. Baker of Brown, Drew & Massey, LLP, Casper, WY.

Representing Appellee: James A. Hardee, Douglas, WY.

Before LEHMAN, C.J., and THOMAS, MACY*, GOLDEN, and HILL, JJ.

LEHMAN, Chief Justice.

This case concerns a disputed piece of heavy machinery, a road grader. Berg Lumber Company sued Richard Cross for the tortious conversion of this grader and for replevin. After a bench trial, the district court awarded Berg damages in the amount of $83,400 and ordered that the grader be returned to Berg. Cross takes issue with the district court's application of the statute of limitations, findings of fact, and calculation of damages. Finding no error, we affirm.

* Retired June 2, 2000.

## ISSUES

Appellant raises three issues:

1. The conclusion of the District Court that the claim of Appellee Berg Lumber Company, Plaintiff below, was not barred by statute of limitations is incorrect as a matter of law and is subject to being corrected by the Supreme Court.

2. The conclusion of the Court at page 1 of the Decision Letter that Crail took the grader without Berg's permission is clearly erroneous, is contrary to both the pleadings and the evidence, and therefore the District Court should have ruled as to whether or not Berg is estopped from asserting ownership to the grader, based on the evidence presented.

3. The Court in awarding damages misapplied the law of damages of the State of Wyoming and made findings and conclusions contrary to both law and to the undisputed facts.

Appellee also discerns three issues:

1. Did the District Court properly determine that Plaintiff Berg Lumber Company's claim was not barred by the Statute of Limitations?

2. Did the District Court properly dispense with a consideration of Defendant's theory of estoppel when no facts were presented to support such a theory?

3. Did the District Court properly determine damages based upon the facts ascertained by the Court and the applicable law?

## STANDARD OF REVIEW

Because this case was decided after a bench trial, the factual findings of the judge are not entitled to the more limited review afforded a jury verdict. 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2585 at 730 (1971). "Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail weighing disputed evidence." *Springer v.*

*Blue Cross and Blue Shield of Wyoming,* 944 P.2d 1173, 1176 (Wyo.1997).

The purpose of specific findings under Rule 52(a) is to inform the appellate court of the underlying facts supporting the trial court's conclusions of law and disposition of the issues. *Lebsack v. Town of Torrington,* 698 P.2d 1141, 1146 (Wyo.1985); *Cline v. Sawyer,* 600 P.2d 725, 730 (Wyo.1979); *Whitefoot [v. Hanover Ins. Co.],* 561 P.2d [717] at 720 [Wyo. 1977]. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. *Shores v. Lindsey,* 591 P.2d 895, 899 (Wyo.1979); 9 Wright & Miller, *[Federal Practice and Procedure: Civil],* § 2585 at 729, 731. Deference is given to the opportunity of the trial court to assess the credibility of the witnesses. *Shores,* 591 P.2d at 899. Because this court does not weigh the evidence de novo, findings may not be set aside because we would have reached a different result. *Shores,* 591 P.2d at 899; 9 Wright & Miller, *supra,* § 2585 at 732–33. The appellant bears the burden of persuading the appellate court that the finding is erroneous. 9 Wright & Miller, *supra,* § 2585 at 729.

On appeal, findings of fact are not set aside unless clearly erroneous. *Shores,* 591 P.2d at 899; *Whitefoot,* 561 P.2d at 720; 9 Wright & Miller, *supra,* § 2585 at 729. The definitive test of when a finding is clearly erroneous was adopted by the United States Supreme Court in *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* at 395, 68 S.Ct. at 542. *See Citibank, N.A. v. Wells Fargo Asia Ltd.,* 495 U.S. 660, 670, 110 S.Ct. 2034, 2041, 109 L.Ed.2d 677 (1990), *cert. denied* 505 U.S. 1204, 112 S.Ct. 2990, 120 L.Ed.2d 868 (1992) (reaffirming the *United States Gypsum Co.* test). Wyoming accepted this

standard for Rule 52(a) in *Shores,* 591 P.2d at 899. Alternatively, a determination that a finding is against the great weight of the evidence means a finding will be set aside even if supported by substantial evidence. *Rocky Mountain Turbines, Inc. v. 660 Syndicate, Inc.,* 623 P.2d 758, 762 (Wyo. 1981); *Shores,* 591 P.2d at 899; 9 Wright & Miller, *supra,* § 2585 at 735 n.10.

Conclusions of law made by the district court under Rule 52(a) are not binding upon this court and are reviewed de novo. *Shores,* 591 P.2d at 900; 9 Wright & Miller, *supra,* § 2588 at 752. "Findings of fact of the trial judge can also lose the insulation of the clearly erroneous standard if they are induced by an erroneous view of the law, *United States v. United States Gypsum Co.,* 333 U.S. at 394, 68 S.Ct. at 541; and *United States v. Richberg,* 398 F.2d 523 ( [5th Cir.] 1968), or contain factual and legal conclusions that reflect the application of an improper legal standard." *Shores,* 591 P.2d at 899–900.

*Hopper v. All Pet Animal Clinic, Inc.,* 861 P.2d 531, 538–39 (Wyo.1993).

 Damages are findings of ultimate fact. In a jury trial, the "jury's determination of the amount of damages is inviolate absent an award so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, or other improper cause had invaded the trial." *Coulthard v. Cossairt,* 803 P.2d 86, 92 (Wyo.1990). But the standard of review after a bench trial is less deferential. "Damages, like apportionment of fault, are reviewed as fact and are not reversed unless clearly erroneous." S. Childress, *A Standards of Review Primer: Federal Civil Appeals,* 125 F.R.D. 319, 330 (1989),[1] (citing *Lincoln Nat'l Life Ins. Co. v. NCR Corp.,* 772 F.2d 315 (7th Cir.1985); *NCH Corp. v. Broyles,* 749 F.2d 247 (5th Cir.1985); *Stern v. Satra Corp.,* 539 F.2d 1305 (2d Cir.1976)).

### FACTS

In 1989, Berg Lumber Company purchased a Caterpillar 120 motor grader for

---

1. This article provides a useful analysis of appellate standards of review and is well respected in the federal court system. *Practitioners' Guide to*

*the United States Court of Appeals for the Tenth Circuit* 42 (1998). Civil practitioners before this court may find it helpful as well.

$19,700. Berg used the grader to push dirt and snow and for road construction, grading, and maintenance. In 1991, Berg moved the grader to its Casper sawmill. At that time, Berg also contracted with Joe Crail to deliver logs to the Casper sawmill.

In October or November, 1991, without Berg's knowledge or permission, Crail took the grader from Casper to Richard Cross' ranch in Converse County, where Crail used the grader to grade access roads to facilitate logging. Crail damaged Cross' property by knocking down gates, burying irrigation ditches, and marring roads. Crail also owed Cross $5,500.00 for logs that he had removed from the property. In November 1991, when he learned that Crail had taken the grader, George Berg telephoned Crail and requested its return. Crail promised to return it. The grader was not returned; and, in the spring of 1992, Berg again spoke with Crail. Crail said he had left the grader on the Taylor ranch and that he did not have the money to hire someone to bring it back. Berg then traveled to Douglas and to the Taylor ranch, where he was unable to find the grader.

Berg later learned that the grader was on the Cross ranch. He went there and saw it at Cross' shop, with the blade down and the wheels off. He spoke with Cross, who told him that he wanted to use the grader to repair the damage done by Crail. Berg agreed with this proposal "to make it right"—meaning that, if his contractor Crail had caused damage to Cross, he would let Cross use the grader to repair that damage. Berg told Cross that the grader's clutch might not be working smoothly. Cross said he would fix it so that he could use it. Berg acquiesced and told Cross he would pick up the grader when the damage was repaired.

During the summer of 1992, Berg sent a truck down from Montana to pick up the grader. Cross did not allow the driver to take the grader, saying he had not yet had time to repair the damage to his ranch. Berg allowed Cross to retain the grader to repair the damage. In 1993, Berg sent another truck to get the grader; but, for reasons not apparent from the record, the grader remained in Wyoming at that time. In June 1994, Berg again tried to reclaim his grader. Cross refused to allow Berg's employees onto his property to view the grader.

In the summer of 1996, Berg's agent called Cross to reclaim the grader. Cross answered this demand by claiming that the grader was gone—that someone had come with a truck and hauled it away. On September 4, 1996, Berg's agent reported this alleged theft to the Converse County Sheriff's Office. Another Berg employee hired an airplane to fly him over the Cross ranch. From this aerial vantage, he located the grader concealed in an area that was not visible from the public road. By and through counsel, Berg formally demanded return of the grader on October 9, 1996. This lawsuit was filed on January 5, 1998.

At trial, both George Berg and Richard Cross testified. Among the other witnesses were several who established various elements of damage, including a heavy equipment expert from Wyoming Machinery Company who testified that the grader had a monthly rental value of $2,500. After hearing all the evidence, the district court entered judgment for the plaintiff in the sum of $83,400 and issued a Writ of Replevin directing Cross to return the motor grader to Berg Lumber. This appeal timely followed.

## I. *STATUTE OF LIMITATIONS*

Cross argues that the four-year statute of limitations in this case began to run in 1993, not 1996, and that this action is therefore time barred. He contends that when Berg sent a truck to the Cross ranch in 1993 to pick up the grader, permissive use expired and the conversion claim accrued.

"[C]onversion occurs when a person treats another's property as his own, denying the true owner the benefits and rights of ownership." *Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 975 (Wyo.1994). To establish a conversion claim, the plaintiff must prove that:

(1) he had legal title to the converted property; (2) he either had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff his

rights to use and enjoy the property; (4) in those cases where the defendants lawfully, or at least without fault, obtained possession of the property, the plaintiff made some demand for the property's return which the defendant refused; and (5) the plaintiff has suffered damage by the loss of the property.

*Marchant v. Cook,* 967 P.2d 551, 556 (Wyo. 1998) (citing *Frost v. Eggeman,* 638 P.2d 141, 144 (Wyo.1981)); *see also McCarthy v. James E. Simon Co.,* 923 P.2d 747, 750 (Wyo. 1996).

■■■ The statute of limitations for the torts of conversion and trespass to chattels is four years. Wyo. Stat. Ann. § 1–3–105(a)(iv)(B) (Lexis 1999). The cause of action accrues when the forces wrongfully put in motion by the defendant produce injury. *Duke v. Housen,* 589 P.2d 334, 343 (Wyo. 1979), *cert. denied* 444 U.S. 863, 100 S.Ct. 132, 62 L.Ed.2d 86. Thus, the four-year limitations period for conversion begins running when the plaintiff knew or should have known that the property was wrongfully converted. *O'Donnell v. Western Nat'l Bank,* 705 P.2d 1242, 1245 (Wyo.1985). A cause of action for the wrongful taking of personal property is not deemed to have accrued until the wrongdoer is discovered. Wyo. Stat. Ann. § 1–3–106 (Lexis 1999).

■■ The district court found that permissive use was extended until 1996. This finding of fact will not be set aside unless clearly erroneous. Although the tortured history of this case reveals that Berg made numerous attempts to retrieve the grader prior to 1996, there is no evidence that Cross engaged in fraudulent or tortious conduct until then. The ongoing negotiations and extensions of permissive use refute the contention that the tort accrued in 1993. It was not unreasonable for the fact finder to conclude that the tort of conversion accrued when Cross lied to Berg and falsely reported that the grader was not on his property. The district court reasoned:

> This case was filed on January 5, 1998, which is less than four years after both the 1994 and 1996 attempts to get the grader back. Consequently, those incidents do not impact this issue. The cause of action

is barred by the statute of limitations only if Berg knew or should have known of Cross's intentions prior to January, 1994. The Court finds that none of the incidents described in the trial testimony that occurred before that date would have given Berg, or any other reasonable person in his position, cause to believe that Cross intended a wrongful detention of the grader to such extent that the statute of limitations for the replevin cause of action should have begun to run. Berg was told, and apparently believed, that Cross needed the grader to repair damage caused by Crail. Later, Cross either told Berg's employees that he was not yet done with the grader, or that it needed repairs, or that he had made repairs on it, or that he needed to speak directly to Berg. The fact that Berg was willing to continue to deal with Cross throughout this ordeal in a non-confrontational manner should not be found unreasonable, and should not be held against him.

Cross has not demonstrated that this conclusion was clearly erroneous.

■■■ Cross also argues that Berg should be precluded from arguing that Cross' possession of the grader was permissive because of contradictory statements in the complaint. Judicial estoppel

> is sometimes referred to as a doctrine which estops a party to play fast and loose with the courts or to trifle with judicial proceedings. It is an expression of the maxim that one cannot blow hot and cold in the same breath. A party will just not be allowed to maintain inconsistent positions in judicial proceedings....

*Allen v. Allen,* 550 P.2d 1137, 1142 (Wyo. 1976). Judicial estoppel requires that "where a man is successful in the position taken in the first proceeding, then that position rises to the dignity of conclusiveness." *Erhart v. Flint Engineering & Const.,* 939 P.2d 718, 724 (Wyo.1997) (citing *Hatten Realty Co. v. Baylies,* 42 Wyo. 69, 290 P. 561, 566 (1930)). There is no indication in the record or briefs that Berg was ever successful in the position at issue; but since the judicial estoppel argument is not supported by cogent

argument or pertinent authority, we will not consider it. *See May v. May,* 945 P.2d 1189, 1191 (Wyo.1997).

## II. *APPELLATE REVIEW OF FACTUAL FINDINGS*

 Cross contends that the district court was clearly erroneous when it found that Crail took the grader without Berg's permission. Cross then reasons that Berg is estopped from asserting ownership of the grader. The district court found

> that Berg did not, as a matter of fact, allow Crail to deal with the grader as if it was his own. The testimony was that Crail took the grader without Berg's permission, and that as soon as he discovered the taking, Berg began to try to get the grader back from Crail. There was no evidence that Berg in any way authorized Crail in general to treat the grader as if he owned it, or that he authorized Crail in particular to deal with Cross in regard to the grader. It would be more tempting to surmise from the evidence that Crail actually lied to Berg as to the whereabouts of the grader, perhaps because, as Cross claims, Crail had already "given" Cross the grader as payment or security on a debt.

This factual finding is supported by ample evidence in the record. Cross argues that Berg admitted in the complaint that he authorized Crail to utilize the grader. Crail was authorized to use the grader, but not to take it. Berg never authorized Crail to take the grader to Cross' ranch.

In effect, Cross argues that he is a bona fide purchaser, an innocent third party who was mislead by Crail's apparent authority to dispose of the grader. This argument, however, would only apply if Cross were asserting legitimate ownership of the grader. But Cross himself disclaimed any ownership interest in the grader. He asked Berg if he could borrow the grader to repair damage done by Crail. One does not seek to borrow that which he already owns. And under questioning from the bench, Cross admitted that he knew the grader was not his: "I never wanted the grader. I think I always made that clear to anybody that Mr. Berg sent, that I didn't want the grader. I just

wanted to be paid." And he admitted that Berg did indeed claim ownership of the grader: "I didn't know that he owned the grader. I mean, he told me, but that didn't mean he owned it."

The district judge, as fact finder, had the opportunity to gauge the demeanor and assess the credibility of live witnesses who told confusing and contradictory stories. We cannot determine, based on appellate review of a cold record, that these findings of fact are clearly erroneous.

## III. *DAMAGES*

 Appellant contends the district court's damage calculation was erroneous because the court relied upon an improper legal standard. While damages are normally subject to clear error review, the underlying legal standards are pure issues of law subject to *de novo* review.

The district court awarded $83,400 in incidental damages as follows:

1. Return of the grader.
2. $10,000.00 to repair the engine.
3. $400.00 to replace the cutting edge and batteries.
4. $900.00 for tire replacement (50% depreciation).
5. $4,600.00 for costs of attempted recovery of the grader.
6. $67,500.00 for loss of use ($2,500.00 × 27 months since 10/96).

Each of these damage components was supported by competent nonspeculative evidence.

### *Replevin*

 The proper remedy in a replevin action is return of the detained property plus incidental damages:

> Although the action of replevin is founded upon a tortious detention, it is not one to determine claims sounding in tort. It is analogous to an action of trespass, but is in part a proceeding in rem, to regain possession of the goods and chattels, and in part a proceeding in personam, to recover damages for the caption and detention, and is based not upon any act of the plaintiff, but upon the illegal acts of the defendant. It

is a possessory action the gist of which is the right of possession in the plaintiff. The primary relief sought therein is the return of the property in specie; damages are merely incidental.

66 Am.Jur.2d *Replevin* § 3 (1973) (footnotes omitted). In the case at bar, the plaintiff did not style the action as one for replevin, but that is how the district court analyzed it. Replevin, trespass, and trover (conversion) are concurrent remedies for a wrongful taking of goods. *Id.* at § 6. Appellant does not contest the order directing him to return the grader in his damages argument.

### Repair Costs

Wyoming Machinery's expert witness testified that it would cost between $4,500 and $12,000 to repair the grader's engine. His best estimate was between $10,000 and $12,000. Although there was some conflicting evidence, and a dispute over who caused the damage, the fact finder was certainly free to accept these figures and assign $10,000 in damages to repair the engine. One should note that there was evidence that the grader became inoperable while wrongfully detained by Cross. The $10,000 repair cost finding is not clearly erroneous.

### Maintenance Costs

The trial court assigned $400 to replace the cutting edge and batteries and $900 to replace worn tires. These findings were supported by expert testimony. The expert also testified that these costs may result from normal use. While Cross maintains that he only used the grader for about an hour and that Crail should be held responsible for this damage, the fact finder was free to disbelieve this testimony. These determinations are not clearly erroneous.

### Special Damages

One of Berg's employees testified that the cost of numerous attempts to retrieve the grader and of hiring an airplane to search for the grader amounted to $4,600. Appellant objects that these costs should not be recoverable because they preceded the date when the tort accrued in 1996.

Berg did not discover the conversion until 1996 because Cross purposely misled him as to his true intentions. One can reasonably infer from the circumstances that Cross never intended to return the grader, that he lied to Berg when he promised to return it. Thus, the wrongful detention predates the discovery and accrual of the tort by several years. Under this interpretation, it is reasonable to assess recovery costs preceding the discovery of the conversion.

Recovery costs are a species of special damages and must be specially pleaded and proved. General damages are those which naturally and necessarily flow from the wrongful act; they are implied by law and are the natural consequences of the wrongful act. *Henderson v. Coleman,* 19 Wyo. 183, 115 P. 439, 448 (1911), *reh'g denied* 19 Wyo. 183, 115 P. 1136 (1911). General damages need not be pled. *Western Alfalfa Milling Co. v. Worthington,* 31 Wyo. 82, 223 P. 218, 220–221 (1924). Special damages are not the necessary result of the wrongful act and are not implied by law; they must be specially pled with a reasonable degree of particularity, although one need not plead a sum certain. W.R.C.P. 9(g); *Melehes v. Wilson,* 774 P.2d 573, 579 (Wyo.1989); *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng.Rep. 145 (1854).

In the instant case, the plaintiff pled several elements of special damages relating to the recovery of the grader. There was sufficient testimony to support the court's allocation of $4,600 in special damages. This finding is not clearly erroneous.

### Restitutionary Damages

The court awarded $67,500 for loss of use, based on $2,500 per month for 27 months between the date of conversion (October 1996) and the date of trial (January 1999). In effect, this is an award of restitution requiring the tortfeasor to disgorge the amount by which he was unjustly enriched by his wrongdoing. Appellant complains that this determination is legally erroneous, as this amount exceeds the quantum of Berg's injury.

Wyoming recognizes that there are several methods for computing conver-

sion damages. "Valuation of property is a question of fact, and there is no universal standard for such a determination. Thus, the question is left to the trier of fact to be decided on the basis of the facts and circumstances of each case." *O's Gold Seed Co. v. United Agri–Products Financial Services, Inc.*, 761 P.2d 673, 676 (Wyo.1988). In computing damages, "the primary objective [is] to determine the amount of loss, applying whatever rule is best suited to that purpose." *Id.*

█ Although actions in replevin are "restitutionary in character, they are classified as tort actions." *Ablah v. Eyman*, 188 Kan. 665, 365 P.2d 181, 190 (1961). Restitutionary damages may be an appropriate remedy for the tort of conversion where other methods of computing damages are inadequate. "For some types of tort actions and for certain kinds of breaches of contract, the injured party has an option of seeking restitutionary recovery. In these cases, damages are measured by the benefits received by the defendant rather than the losses sustained by the plaintiff." 22 Am.Jur.2d *Damages* § 34 (1988) (footnotes omitted). *See also* Restatement, *Restitution*, §§ 150–154.

> The plaintiff may "waive the tort and sue in assumpsit," meaning that the plaintiff can have a restitutionary recovery for the gains the defendant made by converting the chattel. For example, if the chattel was worth $10 when it was converted by the defendant, and he later sells it for $20, the plaintiff would choose this option.

Dobbs, *The Law of Torts* § 67 (2000).

█ Historically, there has been much confusion about assumpsit and restitutionary remedies. At common law, assumpsit was a form of action whereby a legal obligation was implied at law. *See* Arthur L. Corbin, *Waiver of Tort and Suit in Assumpsit*, 19 Yale L.J. 221 (1910). One British jurist noted that "the whole history of this particular form of action has been what I may call a history of well-meaning sloppiness of thought." *Holt v. Markham*, 1 K.B. 504, 513 (1923).

"Restitution based upon unjust enrichment cuts across many branches of the law, including contract, tort, and fiduciary relationship, but it also occupies much territory that is its sole preserve." G. Palmer, *Law of Restitution* § 1.1 at 2 (1978).

Unjust enrichment is an indefinable idea in the same way that justice is indefinable. But many of the meanings of justice are derived from a sense of injustice, and this is true of restitution since attention is centered on the prevention of injustice. Not all injustice but rather one special variety: the unjust enrichment of one person at the expense of another. This wide and imprecise idea has played a creative role in the development of an important branch of modern law.

*Id.* at 5 (footnotes omitted).

█ In modern terms, an action of assumpsit is not technically a waiver of tort, but rather it is the choice of one of two alternative remedies. *Ablah v. Eyman*, 365 P.2d at 192. "One whose money or property is taken by fraud or embezzlement, or by conversion, is entitled to restitution measured by the defendant's gain if the victim prefers that remedy to the damages remedy." Dobbs, *Law of Remedies* § 4.1(1) p.553 (1993).

█ In civil jurisprudence, Wyoming has adopted and still employs the English common law as modified by decision. Wyo. Stat. Ann. § 8–1–101 (Lexis 1999); *see State v. Foster*, 5 Wyo. 199, 38 P. 926 (1895). Restitutionary damages for conversion have been long recognized in the law:

> It is obvious that the owner of property, which has been wrongfully converted, should possess a right to institute such a suit for the injury as will afford him an ample indemnification. If the wrong doer hath sold, or used and then sold the property, the owner may waive the tort, and in assumpsit recover the net proceeds received both for the use and by the sale. *Cowp.* 371, *Hambly vs. Trott*; 10 *Mass. Rep.* 436. The amount recoverable in assumpsit cannot, upon general principles, operate unfavorably to the trespasser.
>
> **In an action *ex contractu*, nothing can be obtained from him except what has in fact been received for the use and by**

sale of the property: **while in one** *ex delicto,* **he may be subjected vindictively to pay much more than the real value of the article converted.** Considering him, therefore, in the words of Jackson, J., in *Cummings et al. vs. Noyes,* 10 *Mass. R.* 436, as "a purchaser, or agent, or a bailee," gives him no just cause of complaint, because it visits on him no actual loss; the amount recovered being merely the amount obtained as the fruits of the trespass.

*Chauncy v. Yeaton,* 1 N.H. 151, 154–55 (1818) (emphasis supplied).

▉▉▉▉ Wyoming has recognized that restitutionary damages are historically related to, yet distinct from, the equitable cause of action termed "unjust enrichment":

. The plaintiff's claim, as set out in his complaint, is for the benefit gained by the joint tortfeasors' action. If a benefit is derived by the wrongdoers, recovery may be had on the basis of a promise implied in law and the benefit recovered. *Ablah v. Eyman,* 1961, 188 Kan. 665, 365 P.2d 181, 90 A.L.R.2d 766; *Creach v. Ralph Nichols Co.,* 1953, 37 Tenn.App. 586, 267 S.W.2d 132; *Swope v. Pageton Pocahontas Coal Co.,* 1947, 129 W.Va. 813, 41 S.E.2d 691; *Olwell v. Nye & Nissen Co.,* 1946, 26 Wash.2d 282, 173 P.2d 652, 169 A.L.R. 139; *Felder v. Reeth,* 9 Cir.1929, 34 F.2d 744. *See also* the discussion in *Restatement of the Law, Restitution,* on recovery of benefits tortiously acquired, beginning at p.522, and Oleck, *Damages to Persons and Property,* 1961, § 206, p.371, *et seq.*

The touchstone of the rule is the moral obligation arising out of unjust enrichment to the tortfeasor. The principle is of ancient origin. It has lost its early common law fictions and is firmly entrenched as a cause of action with only its "historical echoes" remaining.

*Western Nat'l Bank of Casper v. Harrison,* 577 P.2d 635, 641–642 (Wyo.1978) (footnote omitted).

▉▉▉ Thus, restitution is an appropriate remedy for some tortious conduct. *See also, Colo. Interstate Gas v. Natural Gas Pipeline Co.,* 661 F.Supp. 1448, 1479 (D.Wyo. 1987), *rev'd on other grounds* 885 F.2d 683, 697 (10th Cir.1989). Despite the historic limitation on the assertion of equity jurisdiction, the availability of the legal restitution remedy is not dependent upon inadequacy of alternative remedies. G. Palmer, *Law of Restitution* § 1.6 at 33–34 (1978).[2]

The phrase "unjust enrichment" is used in law to characterize the result or effect of a failure to make restitution of, or for, property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor. It is a general principle, underlying various legal doctrines and remedies, that one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly.

*Rocky Mountain Turbines, Inc. v. 660 Syndicate, Inc.,* 623 P.2d 758, 763 (Wyo.1981) (quoting 66 Am.Jur.2d *Restitution and Implied Contracts* § 3, (1973) p.945); *see also Roberts v. Roberts,* 64 Wyo. 433, 196 P.2d 361 (1948), *reh. denied* 64 Wyo. 433, 197 P.2d 697. Where wrongfully detained property has a value for use, the measure of damages is the value of such use during the detention period. 66 Am.Jur.2d *Replevin* § 120 (1973) (citing, *inter alia, Ablah v. Eyman,* 188 Kan. 665, 365 P.2d 181 (1961)).

▉▉▉ Commentators have also termed the restitutionary measure an "accounting of profits":

An accounting of profits usually has three basic justifications: (1) it represents compensation to plaintiff for sales that were improperly diverted from plaintiff to

---

**2.** The distinction between legal and equitable restitution is a fine one which would not affect the outcome of this case. The primary difference is that with legal restitution, the parties have a right to a trial by jury. As this case was tried before a judge and neither party requested a jury trial, this issue is inapplicable.

defendant because of defendant's acts; (2) it prevents unjust enrichment by a defendant; and (3) it deters willful violations of law. An accounting may be ordered even if defendant actually lost money on a prohibited transaction, or made no profit at all.

Cerillo, *Proving Business Damages* § 143 (2 nd ed.1991).

The unjust enrichment accounting approach is more appropriate where the defendant's conduct is especially egregious:

Such an "unjust enrichment" approach is especially appropriate where strict application of some other standard would not adequately compensate plaintiff in a case where an injustice has taken place, or to deter willful violations in the future. An accounting is also useful where plaintiff may have difficulty proving lost profits because it is a new business without an operating history. If a defendant's profits as a result of an improper interference exceed what plaintiff would have realized if there were no breach of contract, i.e., defendant's profits exceed plaintiff's losses, some courts still assess damages based on the amount of the profits defendant has obtained. The purpose of this is to prevent inequity. *See National Merchandising Corp. v. Leyden*, 370 Mass. 425, 348 N.E.2d 771, 775 (1976) (holding an accounting of defendant's profits an acceptable basis of damages "because an intending tortfeasor should not be prompted to speculate that his profits might exceed the injured party's losses, thus encouraging commission of the tort ..."). Unless an accounting is made of defendant's profits, parties will be tempted to engage in the conduct at which the tort is aimed in the hope that they may profit from their own wrongdoing. *See also Phillips Chemical Co. v. Morgan*, 440 So.2d 1292 (Fla.Dist.Ct. App.1983), *petition for review denied*, 450 So.2d 486 (Fla.1984); *Schechter v. Friedman*, 141 N.J.Eq. 318, 57 A.2d 251 (1948). Cerillo, § 534.

The district court in this case found that Cross' conduct was "certainly egregious," but did not rise to "the level of misconduct necessary to support attorney's

fees or punitive damages." Although there are some overlapping policies underlying the doctrines supporting punitive damages and the unjust enrichment remedy, they are not the same. One purpose of tort damages is to compensate the plaintiff for his loss, but the measurement of such loss is not always an exact science. Since restitution may exceed mere compensation to the plaintiff without exceeding the defendant's unjust gain, it is not punitive. Dobbs, *Law of Remedies* § 4.1(4). In the context of conversion, courts have recognized the legitimacy of restitutionary damages:

However plausible, the appellant cannot be heard to say that his wrongful invasion of the respondent's property right to exclusive use is not a loss compensable in law. To hold otherwise would be subversive of all property rights since his use was admittedly wrongful and without claim of right. The theory of unjust enrichment is applicable in such a case.

*Developers Three v. Nationwide Ins. Co.*, 64 Ohio App.3d 794, 582 N.E.2d 1130, 1136 (1990) (quoting *Olwell v. Nye & Nissen Co.*, 26 Wash.2d 282, 173 P.2d 652, 654 (1946)). Thus, the unjust enrichment remedy is not punitive but is one method of compensating the plaintiff's loss. *Id.* at 1135–36. This remedy is particularly appropriate where the plaintiff's loss is more difficult to measure than the defendant's unjustly saved avoidance costs. *See* S. Levmore, *Unifying Remedies: Property Rules, Liability Rules, and Startling Rules*, 106 Yale L.J. 2149, 2157 (1997). Thus, "while inadequacy of the damage remedy is not a prerequisite to restitution, the fact of inadequacy strengthens the case for restitution." G. Palmer, § 1.6 at 39. Certainly, an award of restitution can be harsh and is not appropriate in all cases, but where a tortfeasor consciously and wrongfully misappropriates another's property, he should expect to be dealt with harshly:

The remedy in restitution rests on the ancient principle of disgorgement. Beneath the cloak of restitution lies the dagger that compels the conscious wrongdoer to "disgorge" his gains. Disgorgement is designed to deprive the wrongdoer of *all gains flowing from the wrong rather than*

*to compensate the victim of the fraud.* In modern legal usage the term has frequently been extended to include a dimension of deterrence. Disgorgement is said to occur when a "defendant is made to 'cough up' what he got, neither more nor less." From centuries back equity has compelled a disloyal fiduciary to "disgorge" his profits. He is held chargeable as a constructive trustee of the ill-gotten gains in his possession. A constructive trustee who consciously misappropriates the property of another is often refused allowance even of his actual expenses. Where a wrongdoer is shown to have been a conscious, deliberate misappropriator of another's commercial values, gross profits are recoverable through a restitutionary remedy. *Warren v. Century Bankcorporation, Inc.*, 741 P.2d 846, 852 (Okl.1987) (emphasis in original; footnotes omitted). Even Judge Posner, guru of the law and economics movement, has recognized that restitution has a rightful place in intentional tort cases: "to make the tort worthless to the tortfeasor and thereby channel resource allocation through the market." R. Posner, *Economic Analysis of the Law* 194 (3 rd ed.1986).[3]

■■ In the case at bar, it would be difficult to calculate Berg's loss in terms of opportunity costs. Also, by converting and concealing the grader and then lying about its whereabouts, Cross engaged in willfully deceptive misconduct that should be discouraged. For these reasons, application of the unjust enrichment remedy is appropriate. The question remains, how does one measure the amount to be disgorged? There are five factors that assist in measuring restitution:

1. the increased assets in the hands of the defendant from the receipt of property;
2. the market value of services or intangibles provided to the defendant, without regard to whether the defendant's assets were actually increased; that is, the amount which it would cost to obtain similar services, whether those services prove to be useful or not;
3. the use value of any benefits received, as measured by (i) market indicators such as rental value or interest or (ii) actual gains to the defendant from using the benefits, such as the gains identified in item (5) below;
4. the gains realized by the defendant upon sale or transfer of an asset received from the plaintiff;
5. collateral or secondary profits earned by the defendant by use of an asset received from the plaintiff, or, what is much the same thing, the savings effected by the use of the asset.

Dobbs, *Law of Remedies* § 4.5(1) (footnotes omitted).

■■ The damages awarded in this case are supported by the second factor, the market or rental value of the grader (even if the grader did not prove to be useful); the third factor, the use value of the grader; and the fifth factor, the savings effected by using the grader.

■■■ This measure of damages can be termed negative unjust enrichment, *i.e.*, the defendant was unjustly enriched by not having to rent a road grader. A benefit is conferred upon the defendant where, by tortiously using the plaintiff's property, he saves expense or loss that might otherwise be incurred—benefit is any form of advantage. *Ablah*, 365 P.2d at 190. Thus, to measure negative unjust enrichment or recoverable profit, courts may consider saving of expense. *See Tilghman v. Proctor*, 125 U.S. 136, 146, 8 S.Ct. 894, 899, 31 L.Ed. 664 (1888); *Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894, 932 (10th Cir.1975). "Unjust enrichment can occur when a defendant uses something belonging to the Plaintiff in such a way as to effectuate some kind of savings which results in or amounts to a business profit." *Branch v.*

---

**3.** Conversion (pure coercive transfer) is not an acceptable substitute for purchase on the free market. Restitutionary damages can thus be justified by applying Learned Hand's renowned negligence formula, where the tortfeasor is liable if the cost of reasonable precautions (B) is less than the product of the probability of injury (P) and the magnitude of potential loss (L). (B < PL). *See United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947). Judge Hand's tort calculus can also be applied to intentional torts, where B has a negative value. *See* Posner at 193–95.

*Mobil Oil Corp.,* 778 F.Supp. 35, (W.D.Okl. 1991) (citing D. Dobbs, *Handbook on the Law of Remedies* § 4.5 at 278 (1973); *Tilghman v. Proctor,* 125 U.S. at 146, 8 S.Ct. at 899; *Olwell v. Nye & Nissen Co.,* 26 Wash.2d 282, 173 P.2d 652).

Historically, tort and contract have been the primary fonts of civil liability at common law; yet restitution based on unjust enrichment is also a vital legal theory. G. Palmer § 1.1 at 1–2. Not every circumstance demands application of the disgorgement principal; but in certain cases, where justice so requires, the law empowers judges and juries with this important tool to remedy wrongdoing. This is such a case.

### CONCLUSION

The district court's findings of fact were not clearly erroneous, and its conclusions of law were legally correct.

Affirmed.