NATIONAL MERCHANDISING CORP. *vs.* EDWARD J. LEYDEN. NATIONAL MERCHANDISING CORP. *vs.* COMMUNITY SUBSCRIBERS, INC. & another.[1]

Middlesex. April 7, 1976. — June 9, 1976.

Present: REARDON, QUIRICO, BRAUCHER, & KAPLAN, JJ.

*Contract,* Performance and breach, Covenant against competition. *Unlawful Interference. Damages,* For loss of business opportunity. *Unjust Enrichment.*

Following a consent decree obtained by a seller of advertising for plastic covers on telephone directories, based on prior noncompetition agreements with the plaintiff's employees and enjoining former employees from working for a newly organized, competing corporation and it from competing with the plaintiff, it was held, in an action by the plaintiff for interference with contractual relations against a former executive who had organized and become president of a second corporation which commenced the same business as the plaintiff about a year before the consent decree, to which the president was not a party, and against the second corporation, that the record supported findings by the judge that the second corporation and its president had acted in knowing concert with consent decree defendants in their violations of the noncompetition agreements, and a judgment ordering damages to be paid to the plaintiff by the second corporation and its president was affirmed. [429-430]

An award of damages against a corporation for wilful interference with contractual relations of the plaintiff with advertisers, of roughly ten per cent of the corporation's gross sales, approximately the margin of profit in the business, was affirmed; an unjust enrichment measure was appropriate. [430-433]

An award of damages to a seller of advertising, for civil contempt of a consent decree enjoining the defendant "from soliciting or selling" certain advertising, of the commissions he received from a competitor of the plaintiff was affirmed. [433-434]

Acquiescence in the designation by a judge of a qualified accountant to act impartially for the court in a trial precluded the defendants from questioning this procedure on appeal. [434]

CIVIL ACTION commenced in the Superior Court on August 27, 1974.

---

[1] Samuel H. Schrom.

PETITION for contempt filed in the Superior Court on December 10, 1974.

The cases were heard by *Beaudreau, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Savino J. Basile* for Community Subscribers, Inc. & another.

*Gael Mahony* (*Timothy J. Dacey* with him) for the plaintiff.

KAPLAN, J. These cases, consolidated for trial in the Superior Court, were (1) a proceeding by National Merchandising Corporation (Namco) to hold Edward J. Leyden in civil contempt of a consent decree in Namco's favor to which Leyden, among others, was subject, and (2) an action by Namco against Community Subscribers, Inc. (CSI), and Samuel H. Schrom for inducing breach of, or interfering with Namco's rights in the consent decree viewed as an agreement, and seeking injunctive relief and damages.[2] Namco succeeded in both proceedings and the respective defendants appealed. We took the cases for direct appellate review on our own motion (see G. L. c. 211A, § 10 [A]). We affirm.

We outline the cases, reserving some details to the subsequent discussion. Namco's business has consisted of sending its salesmen into given localities in various parts of the country to sell advertising to the merchants; the advertisements are printed on plastic covers for telephone directories; the covers are manufactured by or for Namco and distributed by it without charge to the telephone subscribers. In 1972, a number of persons working in one or other capacity for Namco broke away and thereafter commenced to work for a newly organized, competing corporation called Creative Marketing Associates, Inc. (CMA).

---

[2] Namco's complaint was in two counts; only the first was tried, the second being reserved. After trial, the judge duly directed entry of final judgment on the first count pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974).

Namco sued some nineteen such persons and CMA in Superior Court, grounding the action, apparently, on breach by the individuals of noncompetition agreements with Namco, in which breach CMA had taken a knowing part, and the upshot was a decree of January 26, 1973, specifically consented to by CMA and each of the twelve individual defendants enjoined. The substance of the decree was that the defendants were enjoined "from soliciting or selling advertisements for telephone directory covers, from planning, supervising or managing such solicitations or sales, and from engaging in the manufacture or distribution of telephone directory covers, either on his or its own behalf or as an agent or employee of any person, firm or corporation" in a prohibited territory consisting of fourteen named States, including the New England States. The injunction was stated to run to September 30, 1974.

Schrom had been an executive of Namco. He withdrew from Namco in May, 1971, but evidently did not work for CMA, and was not a party to the consent decree or the action in which it was entered. In January, 1972, Schrom organized CSI, which he served as president and treasurer. CSI engaged in the same business as Namco in New England and other places; in addition, to the extent of perhaps twenty per cent of its sales, it was developing a "paper products" business including the promotion of certain novelties.

In September, 1973, George F. Stevens, one of the defendants enjoined by the consent decree, and known to Schrom from the period when they were both working for Namco, had a conference with Schrom at the CSI office in East Rochester, New York. An oral understanding or agreement was then reached between Stevens and CSI (through Schrom). Stevens was to undertake managerial responsibilities for CSI in the New England States and to receive an "override" commission on sales by the salesmen working that territory who might be hired after Stevens joined CSI. According to Stevens and Schrom, Stevens was to act as manager only of the paper products division for New England, and was not to concern himself with the

directory cover business. The trial judge, however, concluded that this was a pretense: he found that, with knowledge of the consent decree, Schrom agreed with Stevens that Stevens would supervise and manage the directory cover business, and that Stevens in fact did so until about September, 1974, after the commencement of the present action. It is clear that Stevens himself made some direct sales of directory cover advertising for CSI in New England during this period, and that Leyden and some others enjoined by the consent decree also sold such advertising on commission for CSI in New England. The judge charged CSI and Schrom with guilty knowledge of the substance of these activities also.

Upon findings of fact and order for decree the judge: (1) in the contempt proceeding, assessed damages of $5,784 against Leyden (representing his commissions received from CSI) and enjoined him from soliciting advertising for directory covers in New England until January 1, 1976; (2) in the action for interference with contractual relations, entered judgment against CSI and Schrom for $27,462 (roughly ten per cent of CSI's gross sales of directory covers in New England during Stevens's managership), and enjoined them until January 1, 1976, from employing certain of the defendants named in the consent decree, including Leyden and Stevens, to solicit advertising on directory covers or to manage or supervise such solicitation in the New England States.[3] (There were ancillary injunctive provisions.[4])

On his appeal, Leyden, admitting as he did in his pleadings that he was in contempt of the consent decree, argues that the damages imposed on him, payable to Namco, are

---

[3] As January 1, 1976, had passed when the appeals were heard, any questions about the injunctions in the two cases against solicitation could be regarded as moot. These injunctions were evidently intended to relieve against the momentum which the defendants had obtained unlawfully in New England.

[4] Against the defendants' accepting orders for directory cover advertising in the New England States from certain persons named in the consent decree, etc.

excessive. On their appeal, CSI and Schrom dispute the judge's findings, in effect, that they interfered with Namco's contractual interests, or did so consciously; they contend that the measure of damages applied to them is erroneous; and they raise a question about the judge's use of an accountant as an impartial expert in collating and analyzing certain records of CSI.

1. We need spend but a moment on the contention that the judge was wrong in his central findings that CSI and Schrom consciously subverted the consent decree, or, otherwise stated, acted in knowing concert with Stevens and others in their violation of the agreement which formed the basis of the consent decree. All the testimony is reproduced in the record and it requires no studied reading to see that the judge's findings, far from being "clearly erroneous," as the defendants would have to establish for reversal (see Mass. R. Civ. P. 52 [a], 365 Mass. 816 [1974]), are strongly supported. Namco had no ready means of proving its case except by calling Stevens and Schrom and "emptying" them. Even so it was shown that Schrom was aware as early as February, 1973, that a consent decree had been entered covering former members of Namco's staff. As to the assertions by Stevens and Shrom that Stevens was to steer clear of the directory cover business, these were confounded by the fact that Stevens was paid "override" commissions of $23,199 on directory cover advertising sold by salesmen working in New England; such overrides were a customary method of compensating regional managers in respect to business brought in by the salesmen they supervised. Add to this that direct sales of directory cover advertising were made for CSI by persons under the consent decree: this was established with particular detail out of the records of CSI regarding Stevens ($1,487 direct commissions)[5] and Leyden ($5,784) and two others, John Rotondo ($10,339), and Sanford L. Griff ($2,740). A nice touch was supplied by the fact that Ley-

[5] Stevens also received certain commissions on sales of paper products.

den, while soliciting directory cover advertising and nothing else for CSI, carried a business card in which he was represented as in the paper products division, his pretense thus matching Stevens's.

2. CSI and Schrom argue that under a "tort" measure of damages to be applied to them, the judgment of $27,462 was excessive. For interference with contractual relations, cases in this jurisdiction have awarded to plaintiffs an approximation of their lost profits, evidently on a tort basis.[6] As was said in *H.D. Watts Co.* v. *American Bond & Mortgage Co.*, 260 Mass. 599, 613 (1927), quoting from *Walker* v. *Cronin*, 107 Mass. 555, 565 (1871), "the damage for which recovery is had is 'the loss of advantages . . . which, but for such interference, the plaintiff would have been able to attain or enjoy.' " See *Gentile Bros.* v. *Rowena Homes, Inc.*, 352 Mass. 584, 591-592 (1967). It is recognized that "an element of uncertainty in the assessment of damages is not a bar to their recovery," see the *H.D. Watts* case on later appeal, 267 Mass. 541, 554 (1929); and that where, as here,[7] "the difficulties in determining damages arise in large part from [the defendant's conduct]," *Air Technology Corp.* v. *General Elec. Co.*, 347 Mass. 613, 627 (1964), "[a] reasonable approximation will suffice." *Ibid.* See *Godin* v. *Niebuhr*, 236 Mass. 350, 353 (1920).

The award of $27,462 made here corresponds, roughly, to ten per cent of something less than the sales of di-

---

[6] The particular characterization used is not of overwhelming importance. In the sense that the lost profits resulting from the interference resemble the amount that the same party might recover for breach of the promise by the promisor, the measure might be called contractual. There is, in fact, considerable flexibility in the approaches to damages for interference with contractual relations. See Note, Damages Recoverable in an Action for Inducing Breach of Contract, 30 Colum. L. Rev. 232 (1930); Annot., 84 A.L.R. 43, 94-97 (1933), supplemented by Annot., 26 A.L.R.2d 1227, 1272-1275 (1952). Cf. *Anderson* v. *Moskovitz*, 260 Mass. 523 (1927), where, in lieu of lost profits, various expenditures by the plaintiff on the faith that the contract would be carried out were allowed as damages for third-party interference with the contract.

[7] As indicated at point 3 below, the defendants' reluctance to divulge facts and figures hampered the proof.

rectory cover advertising by CSI in New England from October, 1973, (after Stevens became manager) to September, 1974 — sales that can be taken as infected by violations of the consent decree.[8] The ten per cent may be regarded on this record as an approximation of the margin of profit of Namco, and of CSI as well, on this line of business.[9] There is nothing unreasonable, in our view, in the judge's taking the gross tainted sales of CSI as not exceeding the sales of which Namco was capable, had the interference not occurred. See *Dean* v. *Emerson,* 102 Mass. 480, 485 (1869); Annot., 127 A.L.R. 1152, 1152-1155 (1940).[10] Thus the recovery against CSI and Schrom on a so called "tort" basis appears fair and not extravagant.

If, alternatively, the award is viewed as a recovery by Namco of an amount representing CSI's profits, roughly equating with CSI's "unjust enrichment," we think it is likewise well merited. An accounting of profits — an approximation of the defendant's "unjust enrichment" — often joined with an injunction,[11] has been a well understood feature of actions for "business torts" such as un-

---

[8] Actually, $4,250 of direct sales of directory cover advertising by Stevens were excluded from the total of sales to which the ten per cent was applied.

[9] The president of Namco testified that the net operating profit of that company was between eight and fifteen per cent of sales. Schrom said CSI's margin was about five per cent, but the judge could well be skeptical and fix about ten per cent as the margin for both companies. Cf. *Rombola* v. *Cosindas,* 351 Mass. 382, 386 (1966).

[10] To require precise proof that Namco would have made the sales in fact made by CSI would be inappropriate in the circumstances. It may be noted that, in the nature of these promotions, the success of one company's program in a given place prevents successful sales there by a competitor for a period of at least a few years; this wrongful closing of part of the market may be considered in itself a compensable loss.

[11] In actions at law under the formulary system, there were historic difficulties in "waiving the tort" and suing in general assumpsit for the proceeds where the value to be recovered had not passed in some tangible form from the plaintiff to the defendant. Those difficulties are minimized when the forms of action are abolished. See Comment, Plaintiff's Measure of Recovery for Tortious Inducement of Breach of Contract — Profits or Losses?, 19 Hastings L.J. 1119, 1124-1131 (1968).

fair competition (passing off), and trade name, trademark, and copyright infringement. See *Forster Mfg. Co.* v. *Cutter-Tower Co.*, 211 Mass. 219, 223 (1912) (unfair competition); Restatement of Restitution § 136 (1937). As Namco's claim may be viewed as one for impairment of good will (see *All Stainless, Inc.* v. *Colby*, 364 Mass. 773, 777, 779-781 [1974]), it lies close to the business torts mentioned (see 1 H. Nims, Unfair Competition and Trade-Marks § 16, at 85 [4th ed. 1947]), and calls for the application of a similar damage measure. This result is especially fitting here because CSI and Schrom knowingly abetted the violation of a decree and could very likely have been charged themselves with a civil contempt[12] which can readily entail a disgorging of profits by the contemnor.[13]

While the analogy to unfair competition and cognate torts is convenient, it is not necessary, for there is authority both in the case law[14] and scholarly commentary[15] for

---

[12] As Judge L. Hand said in *Alemite Mfg. Corp.* v. *Staff*, 42 F.2d 832 (2d Cir. 1930): "[A] person who knowingly assists a defendant in violating an injunction subjects himself to civil as well as criminal proceedings for contempt." See *Alves* v. *Braintree*, 341 Mass. 6, 12 (1960); Mass. R. Civ. P. 65 (d), 365 Mass. 832 (1974); Annot., 97 A.L.R.2d 490 (1964).

[13] For the application of such an unjust enrichment theory to the award of damages for civil contempt of decrees enjoining unfair competition, see *Leman* v. *Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 455-457 (1932); *Sunbeam Corp.* v. *Golden Rule Appliance Co.*, 252 F.2d 467, 470, 471 (2d Cir. 1958).

[14] See *Second Nat'l Bank* v. *M. Samuel & Sons*, 12 F.2d 963, 968 (2d Cir.), cert. denied, 273 U.S. 720 (1926); *Federal Sugar Ref. Co.* v. *United States Sugar Equalization Bd.*, 268 F. 575, 582 (S.D.N.Y. 1920); *Schechter* v. *Friedman*, 141 N.J. Eq. 318, 325 (Ct. Err. & App. 1948); *Caskie* v. *Philadelphia Rapid Transit Co.*, 321 Pa. 157, 160 (1936); *Olwell* v. *Nye & Nissen Co.*, 26 Wash. 2d 282, 286-287 (1946).

[15] See D. Dobbs, Remedies §§ 6.1, 6.4 at 432-433, 465 (1973); Dawson, Restitution or Damages?, 20 Ohio St. L.J. 175, 179 (1959); Douthwaite, The Tortfeasor's Profits — A Brief Survey, 19 Hastings L.J. 1071, 1083 (1968); Teller, Restitution as an Alternative Remedy for a Tort, 2 N.Y.L.F. 40, 50 (1956); Comment, Plaintiff's Measure of Recovery for Tortious Inducement of Breach of Contract — Profits or Losses?, 19 Hastings L.J. 1119, 1120, 1131-1137 (1968). See also York, Extension of Restitutional Remedies in the Tort Field, 4 U.C.L.A.L. Rev. 499 (1957).

the direct proposition that an unjust enrichment measure is appropriate for wilful interference with contractual relations. Need and reason combine to support this avenue of recovery, because it will often be difficult to satisfy strictly a conventional tort formula, and because an intending tortfeasor should not be prompted to speculate that his profits might exceed the injured party's losses, thus encouraging commission of the tort. Nor should such a defendant be heard to say that the unjust enrichment remedy is unfairly "punitive" because the plaintiff may recover more than his exact loss, when use of a tort measure might allow the defendant to retain some part of his ill gotten gains. Here, as in other contexts, a plaintiff in proper cases may be permitted alternative routes of recovery. Cf. *Sullivan* v. *O'Connor*, 363 Mass. 579 (1973).[16]

Next, as to Leyden: His contention that the civil contempt assessment against him was excessive is answered by our discussion above regarding measures of damages for business torts and for civil contempt of an injunction

---

[16] In 1937 the Restatement of Restitution, while approving the unjust enrichment measure for tortious use of another's trade name, trade secret, franchise, or other similar interest (see §136), took no position on a like measure for contract interference. See § 133, caveat to comment c. Precedent on the precise point has never been plentiful, but, as indicated in nn. 14 and 15 above, the current is strong for allowing such a remedy in proper cases. The early hesitation might have derived from a feeling that while a trade name or the like was "property," contractual relations were not — a weak explanation. See Teller, Restitution as an Alternative Remedy for a Tort, 2 N.Y.L.F. 40, 50-51 (1956); York, Extension of Restitutional Remedies in the Tort Field, 4 U.C.L.A.L. Rev. 499, 509 (1957). Again, an anomaly might have been seen in applying a different measure to one who tortiously induced a breach of contract than to one who committed the breach (see Comment, Plaintiff's Measure of Recovery for Tortious Inducement of Breach of Contract — Profits or Losses?, 19 Hastings L.J. 1119, 1125-1127 [1968]); but it is not clear why the two should be equated, particularly in an aggravated case like the present where the defendants contrive deceptively to create the opportunity for massive breaches of contract (and violations of a decree) by a number of other persons. Moreover, in appropriate circumstances the unjust enrichment measure might well be applied for the breach of a contract not to compete. See *Uinta Oil Ref. Co.* v. *Ledford,* 125 Colo. 429 (1952) (breach of exclusive sales-territory contract); Dawson, Restitution or Damages?, 20 Ohio St. L.J. 175, 182-183, 186-189 (1959) (discussion of several situations where recovery for unjust enrichment may be a proper remedy for breach of contract).

against such wrongful acts (see also the last remark in n.16). We should add that if there were expenses on Leyden's part or other possible bases for his claiming deductions from the commissions received and to be disgorged by him, then it was up to him to prove them. He absented himself from the trial and did not attempt to establish mitigation on these lines.

3. The defendants CSI and Schrom were the opposite of cooperative in producing records from which their liability and the amount of it could be demonstrated. Certain crucial records, they said, had been stolen from their New York office (this was alleged to have happened very soon after they received a demand to produce them). They also professed concern about disclosing data which they considered to be in the nature of business secrets. To meet the problem of piecing together and analyzing the records ultimately furnished, as well as to preserve any necessary confidentiality, the judge designated a qualified accountant (originally retained to serve as Namco's expert) to act impartially for the court (and to be compensated by the court), subject, of course, to interrogation or counterproof by the parties. The accountant appears to have done the work competently and in the spirit of the assignment. The defendants now raise objection to the procedure, but the objection comes too late, as they acquiesced in the procedure at trial. Thus we need not involve ourselves in the question of the extent of the power of the court to designate an impartial expert (see *Ex parte Peterson*, 253 U.S. 300, 312-314 [1920]), except to say that the device worked out well in the present case.

*Judgments affirmed.*