Gants, Ralph D., J.
On March 21, 1996, CVS Pharmacy, Inc. (“CVS”) entered into an agreement with the defendant Merck & Co., Inc. (“Merck”) regarding a Pharmacy Mailing Program (“the Program”).[2] Under the Program, CVS agreed to mail certain letters that were approved by Merck to CVS customers who had been prescribed certain medications. CVS customers were not asked to consent to their inclusion in the Program. CVS identified which of its customers should receive which of the Merck letters, and provided Ele-nsys Care Services, Inc. (“Elensys”), who CVS had retained to administer the mailings, with a computerized database that included the names, addresses, and dates of birth of these customers, as well as the letter or letters they were to receive. Elensys subcontracted the actual mailing of these letters to another company, W.A. Wilde Company (“Wilde”). Both Elensys and Wilde executed confidentiality agreements that prohibited them from using or disclosing this information for any purpose other than mailing these letters at CVS’s direction in accordance with the Program. CVS did not disclose to Merck the identities of these customers or provide any information regarding its customers, but simply informed Merck of the number of customers to whom such letters were sent. Merck paid CVS $2 for each mailed letter. Days prior to the commencement of this action, CVS publicly announced the termination of the Program.
In June 1997, the plaintiff, Jeffrey Kelley (“Kelley”), who at the time was a CVS customer who had filled a prescription at CVS for a diabetes medication, received one of these letters. The letter was on CVS stationery and ostensibly sent by the “Staff of CVS/pharmacy” but stated in small print on the bottom of the letter that “(fiunding for this mailing was provided by Merck & Co. Inc.” The letter in its entirety declared:
At CVS/pharmacy, we appreciate your business, and we value you as a customer. In addition to filling your prescriptions, we feel it important to keep you informed of the latest information that may help you maintain your good health.
Recently, you might have noticed a lot of “press” regarding high cholesterol and its link with heart disease. That’s because some new studies have finally proven the dramatic health benefits possible for people who take action — to control their own high cholesterol.
For example, the result of a recent landmark study demonstrated that patients with high cholesterol *88 and heart disease, treated with diet, exercise, and cholesterol-lowering drug therapy:
reduced their chance of a heart attack by 34% reduced their need for heart surgery by 37% reducing their chance of succumbing from a cardiovascular incident by 42%
Why should this information interest you?
Because, despite the demonstrated benefits of cholesterol-lowering, only about 25% of patients who are candidates for drug treatment get appropriate therapy. If you are being treated for high cholesterol, ask you doctor if your cholesterol is in the desirable range. This is important, if you want to get the full benefit of your treatment plan.
What if you are not being treated for high cholesterol? If you have a histoiy of heart disease or think you may be at risk for it (for example, if you have diabetes), we encourage you to talk with your doctor about your cholesterol. You could help improve your chances of a healthy future.
If you’d like more information, please call 1-800-776-8243 for a free copy of the booklet, “Surviving High Cholesterol” or feel free to give us a call.
Cholesterol Letter (emphasis in original).[3]
In his Complaint, Kelley has brought various claims based entirely on his receipt of this letter through the Program. Specifically, he claims that CVS, Elensys, and Merck violated his right to privacy and engaged in an unfair and deceptive act or practice by sending these letters through the Program, that CVS breached its obligation to protect the confidentiality of his prescription information, and that it misappropriated information that belonged solely to him.
All parties have filed cross motions for summary judgment. After hearing, this Court ALLOWS IN PART AND DENIES IN PART each cross motion.
DISCUSSION
This Court will address each of the plaintiffs causes of action in turn.
Violation of the Right of Privacy
The statutory tort of invasion of privacy derives from G.L.c. 214, §1B, which provides:
A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages.
While the language of the statute makes it appear that it is sufficient to show that the interference with privacy was either unreasonable or substantial or serious, the Supreme Judicial Court has made it clear that the plaintiff must show that the interference was unreasonable and either substantial or serious. Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 409 Mass. 514, 517-19 (1991); O’Connor v. Police Commissioner of Boston, 408 Mass. 324, 330 (1990).
Even viewing the evidence in the light most favorable to Kelley, as this Court must in a motion for summary judgment, Kelley cannot prevail in proving that he suffered a substantial or serious interference with his privacy. Even if this Court were to assume that it would constitute a substantial or serious interference with Kelley’s privacy for CVS to reveal the medication he was prescribed or his diagnosis of diabetes, there is no evidence that CVS did so here. CVS did not even provide Kelley’s name to Merck. It provided his name, address, and date of birth to Elensys, and directed Elensys to send him the letter described above, but it did not reveal to Elensys his prescription or medical diagnosis. Nor could anyone from Elensys determine what his prescription or medical diagnosis was from the fact that this particular letter was sent to him because Elensys never was informed of the criteria that CVS used to determine which of its customers would receive this letter. Nor is there any evidence that any of the information received by Elensys was made available to anyone other than Wilde, or that either Elensys or Wilde ever breached their confidentiality agreements.[4]
In short, the only private information about Kelley that Elensys reasonably could infer from the information about him that CVS provided was that he was to receive a letter that appeared to be targeted to those who had or were at risk of high cholesterol, and to those who had a histoiy of heart disease or may be at risk of it, perhaps because they have diabetes. Even this meager information was not disseminated beyond Elensys and Wilde because of the confidentiality agreements they had entered into. The limited dissemination of this information falls well below the threshold of a substantial or serious interference with privacy, even if Kelley had sought to keep his diabetes a secret. When one considers that he readily disclosed his diabetes to business associates and personal acquaintances and made no effort to conceal the fact that he had diabetes, it becomes even clearer that the information disclosed by CVS cannot reasonably be deemed a substantial or serious interference with his privacy. See Bratt v. Int'l Bus. Machs. Corp., 392 Mass. 508, 518 (1984) (breach of privacy claims are limited to the disclosure of “facts about an individual that are of a highly personal or intimate nature”).[5]
It is also worthwhile to pause for a moment and reflect upon the practical consequences of finding this conduct to be an unlawful invasion of privacy. There is plainly nothing improper about a pharmacy reviewing its prescription database and providing relevant information to its customers regarding developments in medical or pharmaceutical research, or urging its customers to confer with their doctors as to whether they should adjust their medical protocols or medication in view of these new developments. Nor would it reasonably constitute an invasion of privacy for CVS to provide its clerical staff with the names and addresses of its customers, and tell them who should *89 receive which letters. The plaintiff suggests that this innocent targeted informational letter to customers somehow becomes an illegal invasion of privacy when CVS retains an independent contractor to implement the mailing, rather than rely on its own clerical staff. This Court cannot imagine any good reason to prohibit pharmacies from contracting out this work to a mailing firm, provided they enter into a confidentiality agreement with these independent contractors to prevent further dissemination of this information. Yet, the ruling sought by Kelley would effectively yield that result. As to the law governing privacy, it should matter little whether CVS chose to hire ten new clerical employees to administer these mailings, or retained an independent contractor to do it, as long as all were legally obligated to preserve the confidentiality of the information and the amount of confidential information disclosed to the clerical staff was limited to that necessary to accomplish the purpose of the mailings. See Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 409 Mass. at 519 (courts are expected to define the scope of the right to privacy “on a case-by-case basis, by balancing relevant factors, . . . and by considering prevailing societal values and the ability to enter orders which are practical and capable of reasonable enforcement”).
This Court recognizes that Judge Thayer Fremont-Smith denied summaiy judgment on this claim in this case in 1999, finding that it presented “a novel question suitable for initial resolution by a juiy.” Weld v. CVS Pharmacy, Inc., 1999 WL 494114, 10 Mass. L. Rptr. 217 (Mass.Super. 1999). At the time he denied summaiy judgment, however, the plaintiff class had been certified and this case was a class action, so he properly would have considered all the letters sent by CVS to the plaintiff class. Now, however, the plaintiff class has been decertified, and the only plaintiff is Kelley, so the relevant record on summary judgment is limited to his individual invasion of privacy claim.[6] Moreover, a prior denial of summaiy judgment does not become the law of the case or constitute a final judgment or decree, and does not prevent a subsequent judge from either granting summaiy judgment or a directed verdict, even on the same record. See Riley v. Presnell, 409 Mass. 239, 242 (1991) (affirming the grant of summaiy judgment following the denial of summaiy judgment by another judge). “Although a judge should not lightly undo the work of another judge, the power to reconsider an issue remains in the court until final judgment. Id. (citation omitted). See also Peterson v. Hopson, 306 Mass. 597, 601 (1940) (the power to reconsider “an issue, or a question of fact or law, once decided, . . . remains in the court until final judgment or decree”).
While I greatly admire Judge Fremont-Smith and have carefully considered his reasoning in denying summary judgment, I respectfully disagree with his conclusion that this question is one of fact to be left to a juiy. If this issue were tried to a juiy and the juiy on this record had found that CVS had substantially or seriously interfered with Kelley’s privacy by providing Elensys with his name, address, and telephone number and directing Elensys to send him the Cholesterol Letter, this Court would still believe it obliged to grant judgment notwithstanding the verdict, because, even viewing the evidence in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiffs favor based on this record. See generally Donaldson v. Farrakhan, 436 Mass. 94, 96 (2002) (“The standard applied to a motion for a directed verdict is identical to that applied to a motion for summary judgment . . .”); D’Annolfo v. Stoneham Housing Authority, 375 Mass. 650, 657 (1978) (“The standard to be used on a motion for judgment notwithstanding the verdict is the same as that on a motion for a directed verdict”); Cambridgeport Savings Bank v. Boersner, 413 Mass. 432, 438 (1992). Therefore, a trial would be a futile waste of judicial resources, because the ultimate result could not be altered by the juiy’s verdict. As a result, the defendants’ motion for summaiy judgment as to the plaintiffs invasion of privacy claim is allowed.
Breach of Fiduciary Duty or Common-Law Duly of Confidentiality
In Alberts v. Devine, the Supreme Judicial Court held that, “unless faced with a serious danger to the patient or to others, a physician owes a patient a duty not to disclose without the patient’s consent medical information about the patient gained in the course of the professional relationship, and the violation of that duty gives rise to a civil action for whatever damages flow therefrom...” 395 Mass. 59, 60 (1985). Although this Court knows of no Massachusetts appellate case that specifically extends that same duty to a pharmacist, this Court has no doubt that the duty is the same. See WeZd, 1999 WL 494114 [10 Mass. L. Rptr. 217] (finding Alberts to be “persuasive authority that pharmacists, who share an analogous relationship [to] their customers in so far as private medical information is concerned, also owe a duty of confidentiality, breach of which may be actionable”).
The existence of such a duty is supported by the Board of Registration in Pharmacy’s regulations, which took effect on December 29, 1995, that provided;
A pharmacist shall maintain patient confidentiality at all times. Confidential information shall include information maintained by the pharmacist in the patient’s records or information which is communicated to the patient as part of patient counseling, which is privileged and may be released only to the patient or to those practitioners and other pharmacists where, in the pharmacist’s professional judgment, such release is necessary to protect the patient’s health and well being; and to such other *90 persons or governmental agencies authorized by law to receive such confidential information.
247 Code Mass. Regs. §9.01(19).
CVS’s own Patient Confidentiality & Pharmacy Data Information Security Policy, effective September 11, 1998, recognized that CVS’s Pharmacy Operations Manual includes a section on patient confidentiality that provides that a “patient’s right to confidentiality with regard to their prescription records and health conditions is protected by CVS policy and state pharmacy laws.” Confidentiality Policy at 3-6. That same Confidentiality Policy commits CVS to train its personnel within the pharmacy department “(t)hat they are never to discuss patient information (i.e. medications, diagnosis, treatments, etc.) with other employees or persons outside the pharmacy department.” Id. at 3-5. Moreover, as noted by the Supreme Judicial Court in an interlocutory appeal in this case, “In a brochure entitled ‘The CVS Pharmacy Computer: Working For You,’ CVS assured its customers that only the customer, the customer’s pharmacist, and physician would have access to prescription information, because ‘CVS has always respected the confidentiality of the information in your prescription files and will continue to do so.’ ” Weld v. Glaxo Wellcome, Inc., 434 Mass. 81, 82 n.4 (2001).
This Court finds that it would constitute a breach of the duty that CVS owed to its pharmacy customers to disclose their prescription information, without their consent, to anyone other than “those practitioners and other pharmacists where, in the pharmacist’s professional judgment, such release is necessary to protect the patient’s health and wellbeing; and to such other persons or governmental agencies authorized by law to receive such confidential information.” 247 Code Mass. Regs. §9.01(19). However, as discussed earlier, there is no evidence in the summary judgment record that CVS disclosed to Elensys the medications that Kelley had been prescribed, or information that reasonably would have permitted Elensys to infer what medications he had been prescribed.
Kelley argues that disclosure of his name, address, and date of birth are sufficient to constitute a breach of that duty, but that information, by itself, is not confidential as a matter of law, since it was information that was publicly available from the telephone book and public birth records. While it is true that the disclosure of this information by the CVS pharmacy suggests that he was a customer of the pharmacy and therefore had been prescribed some medication by some physician at some point in time, this Court does not find that information to be so private, standing alone, as to constitute a breach of a pharmacy’s duty of confidentiality to its customer. In short, disclosure of the mere fact that an individual has been prescribed medication is not the stuff of a cause of action for breach of confidentiality against a pharmacy but disclosure of the fact that an individual has been prescribed a particular medication may support a cause of action. Since Kelley has presented evidence only of the former and not the latter, the defendants are entitled to summary judgment on his breach of confidentiality claims.[7]
Misappropriation of Private and Personal Information
Kelley alleges in Countv. of his Amended Complaint that CVS has engaged in a tortious misappropriation of his private and personal information by earning money through the Program from sending him the Cholesterol Letter. Effectively, Kelley claims a violation of G.L.c. 214, §3A, which permits “(a)ny person whose name, portrait or picture is used within the commonwealth for advertising purposes or for the purposes of trade without his written consent” to bring a civil action seeking damages
The Supreme Judicial Court in Tropeano v. Atlantic Monthly Co., however, has made clear that actions brought under G.L.c. 214, §3A are separate and distinct from actions brought under G.L.c. 214, §1B alleging invasions of the right to privacy. 379 Mass. 745, 748 (1980). “(T]he interest which is protected by G.L.c. 214, §3A, is the interest in not having the commercial value of one’s name, portrait or picture appropriated to the benefit of another.” Id. at 749. “The value of one’s name, portrait or picture is not appropriated ‘when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity.’ ” Id., quoting Restatement (Second) of Torts §652C, comment d (1977). Here, there is no evidence that CVS sought to take advantage of Kelley’s “reputation, prestige, or other value associated with him, for purposes of publicity,” when it provided his name and address to Elensys and directed that he receive the Cholesterol Letter. In short, G.L.c. 214, §3A does not bar CVS’s use of Kelley’s name in the Program. If Kelley were famous and CVS used the fact that he was a customer in its advertising without paying him for the use of his name, then he would have a cause of action under this statute.
Violation of Chapter 93A
G.L.c. 93A, §2(a) makes unlawful any “[u]nfair or deceptive acts or practices in the conduct of any trade or commerce.” G.L.c. 93A, §2(a). As the Supreme Judicial Court has made clear, an act may violate Chapter 93A without constituting a cause of action under any common law tort.
Chapter 93A is “a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights.” Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975). The relief available under c. 93A is “sui generis. It is neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action.” Id. at 704. It “mak[es] conduct unlawful *91 which was not unlawful under the common law or any prior statute.” Commonwealth v. DeCotis, 366 Mass. 234, 244 n.8 (1974). Thus, a cause of action under c. 93A is “not dependent on traditional tort or contract law concepts for its definition.” Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 626 (1978). See Nei v. Burley, 388 Mass. 307, 313 (1983) (“[A]nalogies between common law claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate because c. 93A dispenses with the need to prove many of the essential elements of those common law claims”).
Kattar v. Demoulas, 433 Mass. 1, 12-13 (2000).
The Supreme Judicial Court has stated “that the following are ‘considerations to be used in determining whether a practice is to be deemed unfair: (1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness: 2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).’ ” Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986), quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975), quoting 29 Fed. Reg. 8325, 8355 (1964). Consequently, an act or practice that is deceptive or fraudulent may be found to be unfair, but an act or practice need not be deceptive or fraudulent to be unfair. See Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc., 403 Mass. 722, 729 (1989).
The Letter that CVS sent to Kelley did not contain false information, or urge its recipients to act contrary to medical advice, or even promote any particular medication. Indeed, the medical advice in the Letter appears to be sound. Nor did CVS conceal that it had identified Kelley and his address through its prescription records; that could be easily inferred from the first paragraph of the letter. Nor did CVS conceal that Merck had provided funding for the mailing; that was clearly stated on the bottom of the letter. CVS, however, did conceal that CVS received a net profit from Merck for each Letter that it sent. The Program, while it may have educated pharmacy customers, was a profit-making venture for CVS, albeit a rather modest one. Each letter sent by CVS under the Program had to be approved by Merck and Merck paid CVS $2 for each letter sent. Since CVS paid Elensys only 93 cents for each patient education mailing of up to two pages, CVS netted roughly a dollar for each letter.
This Court certainly does not find it unfair for CVS to provide medical information to its pharmacy customers by mail. Nor does this Court find it unfair for CVS to use information in its prescription files — the name, address, and prescription medication of its customers — to identify the customer’s mailing address and to determine which letters are appropriately sent to which customers . . . Nor does this Court find it unfair for CVS to use Elensys or a comparable independent contractor to administer the mailings, provided, as here, the independent contractor executes a confidentiality agreement to protect the information it is provided. Consequently, if CVS had decided that its pharmacy customers were best served by receiving this medical information, arranged with Elensys to mail the letters to its pharmacy customers, and did not receive a net profit for each letter it caused to be mailed, there would be nothing unfair about the mailings. The issue is whether it was unfair for CVS to mail medical information to its pharmacy customers and fail to disclose that it was earning a dollar from Merck for each letter sent.
Pharmacists, as medical professionals, owe a duty of care to their customers presenting prescriptions. See generally Cottam v. CVS Pharmacy, 436 Mass. 316, 320 (2002) (a pharmacy “clearly has the duty to fill prescriptions correctly”). Indeed, it is noteworthy that the regulations of the Board of Registration in Pharmacy speak of such customers as “patients,” which reflects the nature of the relationship that a pharmacy has with its prescription customers. See generally 247 CMR 9.01 (19) (effective Dec. 29, 1995) (requiring a pharmacist to maintain “patient confidentiality”).
Generally, breaches of the duty of care are remedied through the law of negligence, not through Chapter 93A. See generally Darviris v. Petros, 442 Mass. 274 (2004) (lack of informed consent in medical malpractice case is not a ground for a Chapter 93A claim). A medical advice letter from a pharmacy that “possesses ‘a tendency to deceive,’ ” however, is very much the stuff of Chapter 93A, because such conduct is deceptive and, thus, unfair under Chapter 93A. Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 394 (2004), quoting Leardi v. Brown, 394 Mass. 151, 156 (1985). The letter “need not be totally false in order to be deemed deceptive in the context of G.L.c. 93A.” Aspinall at 394. It “may consist of a half truth, or even may be true as a literal matter, but still create an overall misleading impression through failure to disclose material information.” Id. at 395. “In determining whether an act or practice is deceptive, ‘regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which [the act or practice] might reasonably be expected to have upon the general public.’ ” Id. at 394, quoting Leardi v. Brown, 394 Mass. at 156, which quotes P. Lorillard Co. v. Federal Trade Comm’n, 186 F.2d 52, 58 (4th Cir. 1950). Stated differently, a letter “is deceptive when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted . . .” Aspinall at 396.
When a pharmacy provides medical advice to its patients, but fails to reveal to the patient that the pharmacy is making a net profit each time it provides *92 that medical advice, it is depriving its patient of critical information that the patient needs in order reasonably to evaluate that advice. Without such information, the patient, in view of the pharmacist’s duty of care, reasonably may assume that the advice was provided solely out of concern for the health and best interests of the patient. With such information, the patient reasonably may question whether the advice was intended to serve the health and best interest of the patient or the financial health and best interest of the pharmacy. This information is so important to the appropriate evaluation of the advice that it is fundamentally unfair to the patient for the pharmacy to deprive him of it.
CVS contends that it provided fair and full disclosure by stating at the bottom of the letter that “ [funding for the mailing was provided by [Merck].” This disclosure, however, suggests that Merck simply paid for the mailing or reimbursed CVS for its costs regarding the mailing. It does not fairly disclose that Merck’s funding exceeded the costs of the mailing, and that the pharmacy made a net profit for each letter sent. It is disclosure of the fact of profit, not simply disclosure of the fact of funding, that fairly must be disclosed to the pharmacy’s patients who receive such letters in order to enable them reasonably to evaluate the advice given.
Moreover, if such Programs were lawful and pharmacy letters like those sent to Kelley were allowed to proliferate, the quality of patients’ reliance on the written advice of their pharmacists would suffer because patients would not be sure whether the advice was offered solely for their health and safety or was motivated, at least in part, by the pharmacy’s desire to earn a net profit from the pharmaceutical companies who were paying it to offer the advice (and therefore who may have written the advice).
Consequently, a pharmacy is doubly unfair to its patients when it provides written medical advice without revealing that the pharmacy makes a profit from a pharmaceutical company for every letter that is sent containing the medical advice. First, the patient is deprived of essential information he needs to evaluate the medical advice and, second, his ability in general to benefit from such advice is diminished because he cannot be sure whether the medical advice is meant for his benefit or for the benefit of the pharmacy that mailed it.
The unfairness to the patient is seen more clearly if one were to imagine a physician sending a similar letter to her patients as part of a comparable Program, with the physician earning a net profit for each letter sent. The letter, as here, may provide sound medical advice, but if a pharmaceutical company is paying the physician to send the letter and the physician is earning a profit for each letter sent, the patient needs to learn that so that he properly may question whether the letter reflects the physician’s best medical judgment or was motivated at least in part by a desire to earn extra money from the pharmaceutical companies on the side. If the doctor had no duty to tell him, then the patient could not be sure whether the advice the doctor has provided to him is meant for his benefit or for the financial benefit of his physician.
This Court recognizes that the conduct at issue in this case was not specifically barred by any statute or Board of Pharmacy regulation at the time the letter was sent, and that this is the first case that finds such conduct to be unfair. Yet, this Court also recognizes that the Legislature, when it enacted Chapter 93A, did not intend to fix in stone the conduct that constituted an unfair and deceptive act or practice in trade or commerce, and anticipated that the societal understanding of what conduct is unfair would evolve over time with wisdom and experience. This Court believes that it has become generally recognized that pharmacists are medical professionals, that the medical advice they provide to patients should be based on the health and welfare of their patients, and that, if they make a profit each time they provide medical advice recommended by a drug company, they should at least inform the patient that they are profiting from the advice so the patient may better evaluate the merits of that advice.
This Court also recognizes that federal law since 1989 has increasingly addressed the danger of medical decisions being shaped by personal financial benefit by barring physicians from engaging in certain financially self-interested conduct, such as making referrals for clinical laboratory services to a laboratory in which the physician or an immediate family member has a significant ownership interest. See 42 U.S.C. §1395nn (known as the “Stark Laws”). While this Court does not contend that the Program violated the Stark Laws or, indeed, any federal statute, the defendants cannot justly contend that, when they commenced the Program in 1996, they could not reasonably have recognized the possibility that a court would find it unfair for a pharmacy to send letters to its patients providing medical advice without revealing that the pharmacy was making a net profit for each letter sent.
There is yet another reason why it is unfair for a pharmacy to send a medical advice letter to its patients without revealing that it is profiting from each letter sent. Corporations (both private and non-profit) commonly sell mailing lists of its customers or contributors for profit, and this Court knows of no case law finding such a practice to be unfair as a matter of law. Yet, the mailing list that CVS used here is different, because it derives from its prescription files, not from, for instance, the application its customers fill out to obtain a CVS card in order to qualify for advertised discounts. The customer information held by its pharmacy is distinct from other customer information that CVS may have obtained, because while a customer *93 may choose not to obtain a CVS card and therefore remain anonymous when she purchases non-prescription medications, no customer in 1997 lawfully could have obtained prescription medication anonymously. At the time that Kelley was a CVS customer, as today, before it dispensed a prescription medication, the pharmacy must receive the prescription from a licensed physician, identifying the name and address of the person for whom the medication is prescribed, which is why the CVS pharmacy had not only Kelley’s name but also his address. 105 CMR 721.030(3)(d) (effective April 1,1994).[8] Other information in the patient’s records may come from the patient or his physician, but the pharmacy in 1997 could not dispense a prescription medication without at least a prescription from the physician and identifying information regarding the patient. See 105 CMR 721.030(A)(3)(d).[9] The key question then is whether it is an unfair act or practice in violation of Chapter 93A for a pharmacy to use customer information that it obtained for the sole purpose of filling prescriptions for its own financial gain, without the consent of the pharmacy customer. This Court finds that it is.
It would plainly be an unfair practice for a company to sell a customer list when it has explicitly promised customers who provided personal information that it would not sell such a list. While a pharmacy does not expressly make any promise as to its use of prescription information to those who provide it, there are at least two promises that are implicit: (1) the pharmacy will comply with its legal obligation under 247 CMR 9.01(19) to keep the information confidential[10] and (2) the pharmacy will use this information solely for the health and safety of the patient. CVS’s participation in the Program, even if it did not breach its obligation to protect the confidentiality of patient records, violated the second implicit promise. A physician does not provide a pharmacy with the name and address of her patient and the medication she has prescribed for him so that the pharmacy may use that information for its own profit; she provides it because she needs to in order for her patient lawfully to obtain his prescription medication from that pharmacy. Nor does the physician or the patient have any choice in the matter; the patient may not anonymously receive a prescribed medication. Implicit in the legal requirement that a physician provide a pharmacy with confidential medical information in order to fill a prescription for a patient is the reasonable expectation that the pharmacy will only use that information for the health and safety of the patient and will not seek to profit from that information (apart from the profit it obtains from the filling of the prescription). CVS, with the assistance of Merck, failed to respect this reasonable expectation and, in doing so, breached the implicit promise on which the confidential information was provided to it.
In short, it is not an unfair practice for pharmacies to send letters to their patients about health and safety issues, using information obtain from confidential patient records. Nor does this become an unfair practice if the cost of mailing these letters is borne by a pharmaceutical company. It only becomes an unfair practice if the pharmaceutical company goes beyond reimbursement of the cost of mailing, pays the pharmacy an amount likely to generate a significant net profit from the mailing of these letters, and the pharmacy fails to reveal to the patient that it is profiting from the mailing of the letters.
Causation and Loss under Chapter 93A
Having found that the defendants engaged in an unfair and deceptive act in violation of G.L.c. 93A, §2, this Court must now determine whether the unfair and deceptive act caused Kelley to suffer any cognizable damages under G.L.c. 93A, §9.
In 1975, when the Supreme Judicial Court decided Baldassari v. Public Finance Trust, 369 Mass. 33 (1975), G.L.c. 93A, §9(1) provided in relevant part: “Any person who purchases or leases goods, services or property, real or personal, primarily for personal, family or household purposes and thereby suffers any loss of money or property [as a result of] an unfair or deceptive act or practice . . . may . . . bring an action ... for damages.” G.L.c. 93A, §9(1) (emphasis added), quoted in Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 445 Mass. 790, 797 n.15 (2006). In BaldassarU the Court, relying upon this language of the statute, held that Chapter 93A provided a remedy only for the loss of money or property, and offered no remedy for even severe emotional distress. Baldassari, 369 Mass. at 44-46. The Court declared, “We think,... that in §9(1) ‘money’ means money, not time, and that ‘properly’ means the kind of property that is purchased or leased, not such intangibles as a right to a sense of security, to peace of mind, or to personal liberty.” Id. at 45.
In 1979, the Legislature revised §9(1) so that it no longer limited G.L.c. 93A, §9 to those who had suffered loss of money or property, now providing:
Any person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person’s use or employment of any method, act or practice declared to be unlawful by section two . . . may bring an action in the superior court... for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.
G.L.c. 93A, §9, St. 1979, c. 406, §1. See Hershenow, 445 Mass. at 797-98. “The relevant 1979 amendments thus clarified that the Legislature intended to permit recovery when an unfair or deceptive act caused a personal injury loss such as emotional distress, even if the consumer lost no ‘money’ or ‘property.’ ” Hershenow at 798. However, “[n]othing in the statutory language or the legislative history suggests that *94 the 1979 amendments eliminated or altered the requirement of a causal connection to a loss.” Id.
In Hershenow, the Supreme Judicial Court made clear that there is no such thing as a “per se injuiy” under G.L.c. 93A; each plaintiff must prove that the unfair or deceptive act or practice caused it to suffer some loss. Id. at 798-99. It is plain that, with proof of causation, any loss of money or property, no matter how modest, is sufficient to constitute the cognizable loss. Leardi, 394 Mass. at 160 (nominal damages may be awarded). It is also plain that, with proof of causation, severe emotional distress is sufficient. Hershenow, 445 Mass. at 798; Haddad v. Gonzalez, 410 Mass. 855, 865-66 (1991). Although less plain, the majority of the Hershenow Court held that, with proof of causation, “the invasion of any legally protected interest of another” is sufficient. Hershenow, 445 Mass. at 799-800 {“Leardi thus established that, in the wake of the 1979 amendment to G.L.c. 93A, §9, a claim of ’injury’ now encompassed “the invasion of any legally protected interest of another”).
Based on the record in this case, even viewed in the light most favorable to Kelley, there is not sufficient evidence to permit a finding that Kelley suffered any loss of money or properly or significant emotional distress caused by his receipt of the Cholesterol Letter. There is, however, undisputed evidence that the Letter has caused Kelley to suffer actual injuiy yielding nominal damages because, as discussed earlier, CVS made a net profit of roughly $1 from its mailing of this Letter. This Court finds that the disgorgement of profit derived from an unfair and deceptive act or practice is a permissible damage remedy under G.L.c. 93A, §9.
This Court recognizes that Massachusetts appellate courts have yet to address whether the disgorgement of profit is a permissible damage remedy under Chapter 93A. In Hershenow, where no actual injuiy was found, there was no evidence that Enterprise Rent-A-Car in any way profited from including within the plaintiffs’ collision damage waiver provision the illegal sentence, “A violation of any provision of this agreement invalidates Damage Waiver.” See Hershenow at 792-93 (“the automobiles at issue had sustained no damage”). Both the plaintiff and the defendants here cite the only appellate Chapter 93A case that speaks of disgorgement of profit as a remedy — Melo-Tone Vending Inc. v. Sherry—but that case actually is inap-posite. 39 Mass.App.Ct. 315 (1995). There, the plaintiff was essentially seeking its lost profits arising from the defendant’s tortious interference with a long-term contract. The profits the defendant earned from the contractual breach were viewed by the court simply as an approximate measure of the profits that the plaintiff would have enjoyed had the breach never occurred. Id. at 320. The defendants contend that this case stands for the proposition that a plaintiff is entitled to disgorgement of profits only when the plaintiff otherwise would have earned those profits, which Kelley here would not. Kelley contends that this case stands for the proposition that disgorgement of profits is an accepted Chapter 93A remedy. The case did not address either proposition and neither party can find support from it.
In determining whether disgorgement of profits obtained from an unfair or deceptive act is recoverable under Chapter 93A, it is useful first to recall that Chapter 93A is “a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights.” Ciardi v. F. Hoffman-La Roche, Ltd., 436 Mass. 53, 58 (2002), quoting Linthicum v. Archambault, 379 Mass. 381, 383 (1979), which quotes Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975). As noted earlier in this decision, “The relief available under c. 93A is ‘sui generis. It is neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action.’ ” Kattar v. Demoulas, 433 Mass. at 12-13, quoting Slaney at 704.
In cases involving so-called “business torts,” such as the misappropriation of trade secrets, trademark infringement, and tortious interference with contractual relations, the measure of damages “entitles a plaintiff to recover full compensation for his lost profits and requires a defendant to surrender the profits which he realized from his tortious conduct.” Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159, 169-70 (1979). See also National Merchandising Corp. v. Leyden, 370 Mass. 425, 431-33 (1976). “Public policy requires that unfair competitors must not be allowed to profit by their wrongful methods and that those who have been injured by them should receive adequate compensation for the loss or injuiy they have suffered.” Jet Spray Cooler, Inc., 377 Mass. at 170, quoting 2 H. Nims, Unfair Competition and Trade-Marks §419 at 1324-25 (4th ed. 1947). Under this disgorgement of profits remedy, a plaintiff is entitled to “not less than the monetaiy gain which the defendant reaped from his improper acts.” Jet Spray Cooler, Inc., 377 Mass. at 170, quoting 2 Callman, Unfair Competition, Trademarks and Monopolies §59.3 at 496 (3d ed. 1968). “Only in this way can we ensure that an unfair competitor will not be encouraged to proceed with his unfair methods in the hope ‘that his profits might exceed the injured party’s losses.’ ” Jet Spray Cooler, Inc., 377 Mass. at 170, quoting National Merchandising Corp. v. Leyden, 370 Mass. at 433. Therefore, in the context of business torts, a fledgling company whose trade secrets were stolen by an established competitor could recover as damages the ill-gotten profits reaped by its competitor from the use of those trade secrets even if the fledgling company could not establish that it would have been able to profit from the application of those trade secrets, perhaps because it could not demonstrate that it would have obtained the necessary venture capital.
*95 Disgorgement of ill-gotten profit is also a recognized remedy for a breach of fiduciary duly. Berish v. Bornstein, 437 Mass. 252, 271-72 (2002) (“The measure of recovery for a wilful breach of fiduciary duly that results in personal financial gain to the trustee may include disgorgement of the amount of the gain”); Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 556 (1997) (“Where a corporate fiduciary obtains again or advantage through a violation of his duty of loyalty, a court may properly order restitution of the gain, so as to deny any profit to the wrongdoer and prevent his unjust enrichment”). See Restatement (Third) of Trusts, §205 (1990) (“the trustee is subject to such liability as necessary to prevent the trustee from benefiting personally from the breach of trust”). Thus, if an attorney breached his fiduciary duty by investing funds entrusted to him by a client in the attorney’s personal hedge fund rather than a client IOLTA account, doubled the money through this investment, and returned the client’s principal to the IOLTA account, the law does not permit the attorney to keep the fruits of his breach of fiduciary duty simply because the client is not ultimately injured. Rather, the attorney would be required to disgorge the profits arising from his fiduciary breach to the client. The essential principle is that the law does not wish a fiduciary to enjoy personal financial gain from his breach of fiduciary duty.
The common-law principle that the law should not permit a wrongdoer to profit from his wrongdoing must apply with equal force when a pharmacy engages in unfair or deceptive conduct towards its patient in violation of G.L.c. 93A, §9. The unfair and deceptive conduct here would not generally be characterized as a business tort, but it may fairly be characterized as a form of unfair competition. Certainly, once the conduct at issue is determined to be unfair or deceptive, it would make no sense to allow the defendants to keep the profits they reaped from such conduct and provide a financial incentive for such unfair and deceptive conduct to continue.
Similarly, while the relationship between a pharmacy and its patient may not fairly be characterized as fiduciary, the relationship is more than the usual relationship between a retail store and its customer. As noted earlier, the pharmacy has special duties to its prescription customers — at a minimum, a duly of confidentiality, a duty to fill prescriptions accurately, and a duty, if any advice is given of a drug’s side-effects, to ensure that the advice satisfies the standard of care. See generally Cottam v. CVS Pharmacy, 436 Mass. at 320, 325. The Board of Pharmacy recognizes these special duties by referring to a pharmacy’s prescription customers as its patients, reflecting the special medical relationship between a pharmacist and a patient. In view of this special relationship, it is appropriate to provide the disgorgement remedy available to victims of breaches of fiduciary duty to victims of unfair and deceptive conduct in violation of Chapter 93A.
In determining whether disgorgement of ill-gotten profits should be deemed a cognizable damage remedy under Chapter 93A, it is also useful to consider the practical consequences if they are not in light of the legislative intent in enacting and amending Chapter 93A. G.L.c. 93A, §9 provides that only those who have been “injured” by another person’s unfair and deceptive act or practice in violation of G.L.c.' 93A, §2 may bring an action under G.L.c. 93A, §9. Therefore, if the disgorgement of the financial benefits reaped from an unfair and deceptive act or practice does not constitute an “injuiy,” then the plaintiff consumer would not be able to bring an action under G.L.c. 93A, §9 when disgorgement is his only remedy, and would have no legal recourse to prevent the unfair and deceptive act or practice from continuing or to prevent the defendants from profiting from it. This Court does not believe that the Legislature that amended G.L.c. 93A, §9(1) in 1979 specifically to permit consumers to bring Chapter 93A claims when the consumer has suffered no loss of money or property wished to bar consumers from bringing such claims when a defendant business has profited from its unfair and deceptive conduct. Not only would this result in the defendant business being allowed to keep the profits it obtained through its unfair and deceptive conduct but it would also mean that the consumer would be powerless to sue under Chapter 93A to enjoin the unfair and deceptive conduct from continuing.
Therefore, this Court finds, as a matter of law, that Kelley is entitled to recover as damages under Chapter 93A the net profit that CVS obtained from its unfair and deceptive act of mailing him the Cholesterol Letter. Phrased differently, this Court finds, as a matter of law, that Kelley was “injured” within the meaning of G.L.c. 93A, §9(1) from having been denied CVS’s ill-gotten profit from this unfair and deceptive act. This Court need not determine the actual amount of that net profit because it is undisputably more than a penny and less than $25, so Kelley under §9(3) is entitled to the minimum statutory damage award of $25, plus his reasonable attorneys fees.
The Culpable Defendants
The only defendants who participated in the preparation and mailing of the Cholesterol Letter were CVS, Merck, and Elensys, so the other defendants are plainly entitled to summary judgment in their favor. Based on the legal findings in this decision, Kelley is plainly entitled to summary judgment against CVS because it committed an unfair and deceptive act by causing the Letter to be mailed and profiting from it. Kelley is also entitled to summary judgment against Merck, who engaged in an unfair and deceptive act by preparing the Letter and paying CVS to send it at a profit. In contrast, while Elensys administered the mailing of the Letter, directly and through Wilde, Elensys had nothing to do with either the content of the Letter or the financial arrangements by which CVS profited from mailing it. It simply entered into an agreement with CVS to send various letters to CVS *96 prescription patients, promising to protect the confidentiality of the information entrusted to it. Under these circumstances, which are not disputed, this Court finds as a matter of law that Elensys did not commit an unfair or deceptive act by entering into such an agreement with CVS, or by causing Kelley’s letter to be mailed pursuant to that agreement. Therefore, this Court grants summary judgment to Elensys, and limits the judgment to CVS and Merck.
Moreover, on this record, under these circumstances, there is no evidence that the unfair and deceptive act by CVS and Merck was a willful or knowing violation of G.L.c. 93A, §2. Therefore, Kelley’s minimum statutory damage award of $25 shall not be doubled or trebled.
ORDER
For the reasons stated below, this Court ORDERS as follows:
1. The defendants’ motion for summary judgment is ALLOWED, except as to the plaintiffs Chapter 93A claim against CVS and Merck, for which it is DENIED.
2. Plaintiff Kelley’s motion for summary judgment is ALLOWED only as to his Chapter 93A claim against CVS and Merck, and is DENIED as to all other claims and all other defendants. Kelley shall be awarded the minimum statutory award under G.L.c. 93A, §9(3) of $25, plus reasonable attorneys fees and costs under G.L.c. 93A, §9(4).
3. No later than September 28, 2007, the plaintiff shall file an application for such attorneys fees and costs, with appropriate affidavits and supporting documentation. In preparing that application, plaintiffs counsel shall keep in mind that the class has been decertified and that this action will proceed to judgment as an individual action, not a class action.

CVS called the Program the “Patient Compliance Program,” but the letters at issue did not ask its patients to comply with any prescription protocol.

On the second page of the letter, the recipient was given the chance to check a box if he no longer wished to receive “CVS/pharmacy prescription-related mailings.”

In addition, since Kelley’s name was part of a large automated data file, there is no evidence that any human being at Elensys or Wilde actually saw his name. However, while this strengthens the Court’s conclusion that Kelley suffered no cognizable loss of privacy, the Court’s conclusion would not have been different if the mail sorting had been performed manually.

his Court observes that courts in California and Florida, applying the law of their respective states, have rejected invasion of privacy claims brought by plaintiffs concerning similar pharmacy mailing programs. See Klein v. Longs Drug Stores Corp., Civ. A. No. GIC 793438, slip op. (Cal.Super.Ct. June 24, 2003); Doe v. Walgreens Co., Civ. A. No. 01-20843, slip op. (Fl.Cir.Ct. April 11, 2002).

This Court observes that at least some of the other CVS letters sent to other members of the putative class identified the actual medication that the patient had been prescribed. For instance, one letter approved by Merck noted that the patient had been prescribed Zocor, a cholesterol-lowering medication manufactured by Merck. Another letter, approved by Glaxo Wellcome, Inc., noted that the patient had tried to stop smoking using a prescription nicotine-replacement product. Yet another letter, approved by Roche Laboratories, noted that the patient had been prescribed Posicor, which can lower blood pressure and reduce the severity of chest pains from angina.

In view of this finding that the information released did not breach CVS’s fiduciaiy or common-law duty not to disclose Kelley’s confidential information, this Court need not address whether the release of information about Kelley in order to send him the Cholesterol Letter was necessary, in the pharmacist’s professional judgment, to protect Kelley’s health and well being. Nor need this Court consider whether Kelley suffered any cognizable damages from the alleged disclosure of confidential information.

The defendants contend that this CMR did not require that the pharmacist have the name and address of a patient before issuing a prescription but simply required that the “prescription form shall contain space for the practitioner to enter clearly” the name and address of the patient. 105 CMR 721.030(A)(3)(d). This interpretation celebrates form over substance. It is explicit in this regulation that eveiy prescription written in the Commonwealth must be on a prescription form and plainly implicit that the space in the form calling for the patient’s name and address needed to be filled in before the prescription could be filled. Indeed, the Code of Professional Conduct in effect since December 29, 1995 provided, “All pharmacists shall have available sufficient information to contact the patient and the prescribing practitioner.” 247 CMR 9.01(11). The defendants fail to explain how a pharmacist could contact the patient without his name and address.

The defendants note that in March 1998, after Kelley ceased to be a CVS customer, these regulations were changed to require pharmacists to “maintain a confidential record for all patients for whom prescriptions are dispensed,” and to “make a reasonable effort to obtain, record and maintain the following information:
1. name, address, telephone number, date of birth or age, and gender of the patient for whom the prescription is intended:
2. individual history, including known drug allergies and drug reactions;
3. a comprehensive list of medications and relevant devices dispensed by the pharmacy; and
4. the pharmacist’s comments relevant to the patient’s drug therapy."
247 CMR 9.07(l)(a) (effective March 20, 1998). They also note that, even when the regulations were amended in February 2004, they did not require a prescription to contain the date of birth of the patient. 105 CMR 721.020(5) (effective February 24, 2004). It is of no consequence to this decision whether a prescription legally could be issued with or without the date of birth of the patient, or whether CVS as a matter of custom required such information for its patients to avoid the risk of prescription error. It is of consequence that prescription medication could not be provided to a patient without the name and address of the patient and a prescription from a physician.

The pharmacist was required to keep confidential this information, as well as other information maintained by the pharmacist in the patient’s records. 247 CMR9.01(19) (effective December 29, 1995).